HESTONVILLE, M. & F. PASS. RY. CO. et al. v. McDUFFEE et al.†

(Circuit Court of Appeals, Third Circuit. February 21, 1910.)

No. 41.

1. PATENTS (§ 168*)—VALIDITY AND CONSTRUCTION—EFFECT OF DELAY AND AMENDMENTS OF APPLICATION.

Where an applicant for a patent after his application has been rejected and lain dormant for years, during which time the art has made rapid progress, amends the same, and on the basis of such amendment makes claims of a different character, it is the duty of the courts to scrutinize

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied April 11, 1911.

the patent issued carefully to see that it has not been enlarged in scope beyond the invention disclosed in the original application.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 243½–244; Dec. Dig. § 168.*

Amendment of application for patent, see note to Cleveland Foundry Co. v. Detroit Vapor Stove Co., 68 C. C. A. 239.]

2. PATENTS (§ 328*)—VALIDITY—LIMITATION BY APPLICATION—ELECTRIC RAILWAYS.

The Schlesinger patent, No. 546,059, for an electric railway, is void, having been granted on an amended application and claim filed nine years after the original application and seven years after it had been rejected, and which constituted a distinct departure therefrom. The original application was for a device intended for the purpose of localizing the effect of accidents on the line, but in the amended application made, after the art had made a rapid and general advance, was broadened both by additions and omissions.

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

Suit in equity by John I. McDuffee, trustee, and the Allis-Chalmers Company against the Hestonville, Mantua & Fairmount Passenger Railway Company and the General Electric Company. Decree for complainants (181 Fed. 503), and defendants appeal. Reversed.

See, also, 148 Fed. 1023.

Charles Neave and Frederick P. Fish, for appellants.

Clifton V. Edwards, Thomas F. Sheridan, and Jos. C. Fraley, for appellees.

Before GRAY, BUFFINGTON, and LANNING, Circuit Judges.

BUFFINGTON, Circuit Judge. From a decree in the court below adjudging they had infringed patent No. 546,059, granted September 10, 1895, to William M. Schlesinger, assignor to John I. McDuffee, for an electric railway, the Hestonville, etc., Railway Company and the General Electric Company appealed to this court. The opinion of the court below, reported at 181 Fed. 503, so fully sets forth the pertinent facts that reference thereto obviates repetition. On November 25, 1885, which date it will be observed was 10 years before the grant of the patent, Schlesinger filed his application. At that time the electric lighting art was very considerably developed, but the application of electricity to street car service was in its infancy; the first successful installation having been about 1887. In the 1885 specification the invention Schlesinger sought to patent was the division of the consumption circuit of a system of electric distribution into sections, with the added provision of a safety catch for each section. He thus sought to localize or restrict the effects of electrical accidents, so that a mishap on one section would not interfere with the electrical operation of other portions of the system. From the tenor of his application, it is evident that it was substantially immaterial how the current was brought to the several sections, whether by one or many feeders, the gist of the invention being the confining through safety catches of

the effects of an accident to the localized section on which it occurred. In that regard he said, as shown in the file wrapper:

"My invention has relation to that form of electrical railways wherein a line of conductors having generators located along the line of railway for feeding a current to and from end to end of the line or working conductors are used; and it has for its object to obtain safety of traffic or continuity of travel by preventing one or more electrical defects at any point on the line stopping the traffic or travel on the whole line or any extended portion of the same. * * * To accomplish these objects I divide one or both of the line conductors into sections which are disconnected or insulated from one another and provide each section with an electrical or current safety device which is in circuit with a feeding wire or conductor common to all said safety devices, or, one or more of the safety devices may have separate feeding conductors. My invention accordingly consists of a line of conductors one or both of which consist of insulated or disconnected sections, a safety device for each section, and a common or separate conductor for all or any of the safety devices."

Schlesinger's invention was embodied in each of the four drawings following:

FIG. 4.

Referring to the first, second, and third drawings, he says:

"Fig. 1 is a diagram showing line of railway and cars, a generator, a continuous line conductor, a sectional line conductor and safety devices with a common feeding conductor, *embodying my invention.* Fig. 2 is a diagram of generator and line conductors showing both conductors composed of sections each having a safety device and feeding conductors. Fig. 3 is a view showing one of the conductors composed of sections and separate feeding conductors for one or more of the sections and their safety devices. * * * In a railway constructed as above it will, therefore, be noted that any fault or defect in the electrical condition of a conductor section causes it to be automatically cut out of the line or working circuit without affecting the current connection of any other circuit, the traffic or travel upon any other part of the line is not interfered with and travel is only temporarily stopped upon the faulty section of conductor C' and cars arriving at this section are moved over it by any suitable means to keep the travel or traffic safe and continuous."

As showing the particular significance of Fig. 3 to his localizing device, Schlesinger says:

"By providing separate feeding conductors for one or more than one safety device and conductor section C, as shown in Fig. 3, any amount of current but of different electro-motive force may be supplied to the different cars on the line and in the last described construction any one of the separate feeding conductors F forms a reserve wire for connecting it with any one of the other feeding conductors in case of a breakdown or defect occurring therein as shown at S."

It will thus be seen that the gist of Schlesinger's device was the sectionalizing of the line conductor and the confining of the effect of electrical accidents to such sections through safety devices. The contemplated application thereof to railways is shown, for example, by one of his claims as originally made:

"An electric railway having a sectional line conductor for cutting out any of the sections of said conductor without impairing the circuit connections of the remaining sections, substantially as set forth."

And, as emphasizing his invention as residing in the features mentioned, he says:

"I do not confine my invention to any particular kind of safety device, as it may be of an electromagnetic, a fusible strip, or other well-known construc-

185 F.—51

tion of same. Neither do I limit myself to the number or to the length of the sections composing the conductors, nor to the dividing one or both line conductors into sections, nor to the manner of connecting the safety devices to the generator, as it is obvious that the same may be numerously varied without departing from the spirit of my invention."

Now from these extracts it will be seen that, in so far as Schlesinger disclosed his device, it lay wholly in means to localize the effect of accidents, and did not embody the particular means by which current was brought to the individual sections of the working conductor. Indeed, as he stated above, there might be "a common conductor or separate conductor for all or any of the safety devices." It follows, therefore, that the device he disclosed was one which existed in features common as well to a construction in which all its sections were supplied by one feeder as to one in which one or more sections were supplied by separate feeders. The gist with him lay in the control of the supplied current in the individual sections of the system, and not in the manner in which the current was supplied to them.

On October 17, 1887, Schlesinger's application was finally rejected in toto, as being anticipated by the patent to Sprague, No. 323,459, of August 4, 1885, and it now seems that patent No. 329,621, to Byllesby, applied for October 10, 1884, and issued November 3, 1885, the first claim of which was for "(1) a system of electrical distribution comprising one or more generators, main conductors to which said generators are connected, a system of lighting conductors divided electrically into sections, two or more feeding circuits extending from said main conductors, one to each of said sections, and circuit-controlling devices for each feeding circuit, substantially as set forth," substantially disclosed Schlesinger's device, and affords further justification of the Patent Office's ruling. On this rejection of his localizing device the application of Schlesinger lay dormant from 1887 until December, 1894, when an application was made setting forth grounds. which need not be here stated, but which moved the Patent Office to allow the application to be further prosecuted. We are asked to review the grounds of that action of the Patent Office, but, as in our view of the case the patent thereafter issued was void, we express no opinion on the question of the right of this court to so review.

We have, then, a situation where a patent application made in the early stages of the electrical art to electric car service was promptly and properly rejected, and where the rightfulness of that rejection remained unchallenged for some seven years, and, indeed, appears now unchallengeable if the disclosures then made constitute the sole ground for the patent. During this interim there was a rapid and general advance in the railway art and when therefore a patentee, seven years after his original application and enlightened by such intervening years of progress, seeks not to prosecute his original application, but to amend the same, and on the basis of such amendment to make claims of a different character from those originally made, it becomes the duty of a court to zealously and jealously scrutinize such belated application, for to such a situation is applicable the principle laid down by the Supreme Court in Railway Company v. Sayles, 97 U. S. 563, 24 L. Ed. 1053, namely:

"Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alteration, or to appropriate that which has, in the meantime, gone into public use."

And in Corbin Co. v. Eagle Co., 150 U. S. 43, 14 Sup. Ct. 30, 37 L. Ed. 989:

"It is settled by the authorities that to warrant new and broader claims in a reissue such claims must not be merely suggested or indicated in the original specification, drawings or models, but it must further appear from the original patent that they constitute parts or portions of the invention which was intended or sought to be covered or secured by such original patent."

Now, in this case, the renewal of the application and its amendment resulted in the issue of the new claim as follows:

"1. In an electric railway the combination of a series of separate feeding conductors extending in multiple arc relation from one generator pole or terminal to points along the line of way, safety devices for said separate feeding conductors, a working conductor comprising a series of insulated or disconnected sections disposed along the line of way and supported by said separate feeding conductors, and return circuit connections opposed to said sections and leading to the other generator pole, or terminal, substantially as described."

Now to our mind this claim and the amendments made involve a material change and embody a substantially different device from that originally made. The original claims were broadly for sectional working conductors with safety catches for each section irrespective of whether single feeders were used as in Figs. 1, 2, and 4, or multi-feeders as in Fig. 3, while the subject-matter of his present claim comprises separate feeding conductors, thus broadening his device to cover current supply. Thus a matter of inference in the device he originally disclosed is a matter of substance in the device he now claims. This is a material change of front. Moreover, in his present claim the element of safety catches is "safety devices for said feeding conductors," and, to sustain infringement against the defendants using a safety catch at the central station, this claim must locate the safety devices at that point, and not at the sections themselves. But it is clear to us that as originally disclosed every one of Schlesinger's safety devices were out along the line and not at the central station. Indeed, he says in his application:

"As soon as the cut-out or faulty section of conductor C is ascertained, which may be automatically done by means of an electrical indicator located at a central station and in circuit with all the safety devices of the line, as fully described in an application filed of even date herewith."

So, also, in the construction shown in Figs. 1, 2, and 4, the safety devices cannot possibly be placed at the central station and in all of the feeders of Fig. 3, save that at the right which supplies but one section the safety devices could not be located at the central station, or as complainant's expert himself says:

"The one safety device which I have moved into the central station I think is the one farthest from the generator in Fig. 3."

Now there is grave reason for contending that this longest feeder in Fig. 3 was not drawn in that shape to disclose a functional purpose different from the others, for no such purpose is specified in the application, but simply because the draftsman ran out of space. To allow this negligible, unnoted, and indeed unlettered extreme section of the drawing to be made, as it must be, the foundation on which this new claim rests, would be to base the monopoly on possible, instead of certain, disclosure. In that regard the law is clear, and the specification must be equally so, for Rev. St. 4888 (U. S. Comp. St. 1901, p. 3383), says an applicant shall disclose his invention "in such full, concise and exact terms as to enable any person skilled in the art * * * to make and use the same."

Moreover, we think the amended specification and the new claim differ from the original in other respects. We have seen the invention originally claimed was applicable to all four figures; that granted, to but a part of one figure. So, also, an avowed object of the invention as originally made was "to feed them (the cars) the same amount of current but of different electro-motive force," and "any amount of current but of different electro-motive force may be supplied to different cars on the line." These statements were withdrawn, and the insertion made that "it is clear that the potentials or line pressures may be made equal at all points along the line." Moreover, it was not until the amendments that a unitary source of supply was made a necessity, nor was there any claim made on which to base a contention that the safety catches were placed at the central station. The omissions as well as the additions are of importance, for, as said in Plow Co. v. Kingman, 129 U. S. 299, 9 Sup. Ct. 261, 32 L. Ed. 700:

"A reissue must be for the same invention intended to be embraced in the original patent, and cannot be substantially changed either by the addition of new matter or the omission of important particulars, so as to enlarge the invention, as intended to be originally claimed."

It seems, therefore, clear to us that in 1885, when Schlesinger applied for his patent, he had not made and did not disclose the device covered by the claim here involved; that the only device he then disclosed resided in a sectional working conductor with safety catches associated with each section; that his device was common to the single feeder arrangements of Figs. 1, 2, and 4, and the multiple feeder arrangements of Fig. 3; that in his renewed application and amendments Schlesinger claims no device based on Figs. 1, 2, and 4, and only cites them as examples of what should not be done to secure the benefits of his later device, nor does he base such device upon the major part of Fig. 3, which he had previously relied on in toto as embodying his invention. We are therefore of opinion that his amended application and later claim constituted a distinct departure from his prior application, and that the claim in question was wrongfully issued and void.

The decree of the court below must therefore be reversed, and the bill dismissed.