NATIONAL ELECTRIC SIGNALING CO. et al. v. TELEFUNKEN WIRE-
LESS TELEGRAPH CO. OF UNITED STATES.

(Circuit Court of Appeals, Third Circuit. October 20, 1913. Rehearing De-
nied December 9, 1913.)

No. 1,724.

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—METHOD AND APPARATUS
FOR WIRELESS SIGNALING.
The Fessenden patents No. 918,306 for a method of wireless signaling,
the primary object of which is the prevention of atmospheric or other dis-
turbances, and No. 918,307 for apparatus for practicing such method by
means of the conjoint co-operation of a high group frequency transmitting
station and a receiving station with a nonresonant receiver were not an-
ticipated, but are of a pioneer character, embodying an original disclo-
sure of great merit. Both also *held* infringed.

2. PATENTS (§ 328*)—INVENTION—WIRELESS SIGNALING.
The Fessenden patent No. 928,371 for signaling by electro-magnetic
waves addressed to provision for tuning the circuits in apparatus is void
for lack of invention, in view of the prior art.

3. PATENTS (§ 202*)—ASSIGNMENT—DATE OF TAKING EFFECT.
An assignment of a patent passes title at the date of its execution and
delivery, although it is acknowledged by the assignor at a later date.
[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 281–289; Dec.
Dig. § 202.*]

4. RECEIVERS (§ 80*)—SUIT FOR INFRINGEMENT—PARTIES—RIGHT OF RECEIVERS
FOR COMPLAINANT TO INTERVENE.
Receivers for a corporation vested by the order of appointment with
all the property of the corporation, with the right to sue for the recovery
of any property, chose in action, or demands, and to whom the corpora-
tion, in compliance with such order, also made an assignment of all its
property and rights, including patents with the right to sue for past in-
fringement thereof, are authorized to intervene and carry on a pending
suit for infringement brought by the corporation.
[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 149; Dec. Dig.
§ 80.*]

5. WORDS AND PHRASES—"TUNE"—"TUNING."
The term "tuning" as used with reference to signaling by electro-mag-
netic waves, or wireless telegraphy, means the bringing of two or more
electrical circuits into resonance, or the adjustment of capacity and in-
ductance to secure the time-period vibration or wave length desired. The
wave length assigned to a station might be called its "tune."

Appeal from the District Court of the United States for the Eastern
District of Pennsylvania; J. Whitaker Thompson, Judge.

Suit in equity by the National Electric Signaling Company and Sam-
uel M. Kintner and Halsey M. Barrett, receivers, against the Tele-
funken Wireless Telegraph Company of the United States. Decree
for defendant, and complainants appeal. Reversed.

Melville Church, of Washington, D. C., and F. W. H. Clay, of Pitts-
burgh, Pa., for appellants.
Hector T. Fenton, of Philadelphia, Pa., for appellee.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit
Judges.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

BUFFINGTON, Circuit Judge.  In the court below, Samuel M. Kintner and Halsey M. Barrett, receivers of National Electric Signaling Company, brought suit against the Telefunken Wireless Telegraph Company of the United States, charging it with infringing three patents, viz., claims 1 and 3 of patent No. 918,306, to Reginald A. Fessenden, for a method of wireless signaling, applied for July 1, 1907, and granted April 13, 1909; claims 1, 2, 3, and 4 of patent No. 918,307, to the same, for apparatus for wireless signaling, applied for August 25, 1908, and granted April 13, 1909; and claims 1, 2, 3, 5, and 6 of patent No. 928,371, to the same, applied for May 4, 1906, and granted July 20, 1909, for signaling by electro-magnetic waves.  The court below dismissed the bill, whereupon plaintiffs took this appeal.

[1]  Turning first to the process patent No. 918,306, for a method of wireless signaling, and to No. 918,307, the divisional application for apparatus used in working such process, we find the art involved is that of wireless telegraphy and the process patent, as stated therein, "relates to electric signaling, and especially to methods of prevention of atmospheric or other disturbances, which is its primary object."  Since wireless signaling necessarily employs a sending operator and a transmitting apparatus and a receiving operator and a receiving apparatus, and since Fig. 3 shows an arrangement of circuits for use in sending, and Fig. 4, an arrangement of circuits for use in receiving, it is clear that the "method of wireless signaling" concerns both the sending and receiving of such messages.  It is of course a mere truism to say, but a fact to be borne constantly in mind in considering this case, that the vital point in such telegraphy is the intelligent reproduction of the message at the receiving station; and, unless this is effected, all prior efforts, methods, and distinct apparatus go for naught.  As the wireless art was developed no difficulty was found in creating at sending stations electric disturbances of the ether which evidenced themselves at distant receiving stations; the trouble arose in their intelligent reproduction at the latter.  In receiving them the operator met other and interfering electrical disturbances.  These latter might be either signals from other stations, or those created by atmospheric electric discharges.  The former we refer to as station, the latter as static, electricity.  This station and static might be so light as to cause the receiving operator no trouble, or so powerful as to interfere with and indeed prevent him from recognizing and deciphering the message.  The interference due to other stations corresponds, in a general way, to that confusing "cross talk" which one listening on a telephone hears not only from the person speaking to him, but the stray talk coming from electrically adjacent circuits.  In the same way comes the disturbing cross talk of all other wireless stations within range.  Wholly independent of these artificial or station interferences are the disturbances that come from nature.  Such interferences, which are called static, vary in power from the lightning discharges in storms to those delicate restorations of electric equilibrium in the upper atmospheric regions, only capable of being manifested to the senses through the extraordinarily sensitive receiving apparatus used in wireless telegraphy.  It is these lightning disturbances which, of course, interfere during storms.  In a lesser, but

nevertheless confusing, manner lightning and atmospheric electric phenomena generally interfere with wireless receiving at most seasons and in all parts of the world. Such interference is generally more prevalent by day than by night, and more so in the tropics than in the temperate zones. In the latter they also evidence themselves more in summer than in winter. Station and static disturbances, and principally the latter, are the bugbears of the wireless receiving art; at times they prevent the operator from receiving anything, and at others cause him to misread signals and to confuse messages. On that subject complainant's witness Pickard says:

"At practically all times our atmosphere is in a state of disturbed electric equilibrium: different strata and even masses of air in the same stratum being at relatively large differences of potential. From time to time balance is partially restored by electrical discharges, either from stratum to stratum, or even from the charged air to the receiving antenna itself. At each such discharge, which is in reality a miniature bolt of lightning, electrical waves are radiated, often of very great intensity. Although these waves are usually highly damped—that is to say, of a 'whip-crack' character—and therefore very different from the waves which it is desired to receive, it is often impossible to entirely 'tune' them out, owing to their intensity. * * *

"During severe static an operator listening in the receiving telephone hears an almost continuous crackle and snap, often deafening in intensity, varied at times by sounds resembling that of handfuls of gravel thrown violently against a window pane. From such a jumble of loud noise it is often impossible to pick out and interpret the fainter sounds of the ordinary wireless sending. It is impossible to concentrate the attention on such faint sounds, overlaid as they are with a distracting riot of noise, and as a result the operator can only pick out a word or a letter here and there; the message as a coherent whole being entirely lost.

"Sharp tuning of the oscillation frequency of the distant station, while reducing to an extent the loudness of static, has been found far from a complete remedy. This may best be understood by an acoustical analogy. If one sings the note A near a piano with the damper raised, only the A string will respond. If, however, one strikes the back of the piano violently with a sledge hammer (which is not 'tuned' at all) the A string, and every other string as well, is set into vibration. So, with the untuned sledge-hammer blows of the atmospheric disturbances, even a very sharply tuned receiving circuit is set into strong electrical vibrations."

It will be noted also that the tone of such atmospheric disturbances was similar to that of the 60 cycle machines in the ordinary commercial use prior to these patents. To the elimination of the effect of the raid, so to speak, of these hostile electrical guerillas at the receiving station, Fessenden addressed himself, stating, as we have seen, that his invention relates "especially to methods of prevention of atmospheric and other disturbances, which is its primary object." And that he, at least, thought the crucial and effective object of his method was to eliminate the trouble at the receiving point is evidenced by the statement in his specification as originally filed that, "By my apparatus and method herein described, I succeeded in annulling the effects of disturbances and more particularly such atmospheric disturbances," effects, it will be observed, that concern and evidence themselves wholly at the receiving station. We take this opportunity to emphasize this fact because we deem it essential to a proper appreciation of the real significance of these two patents. So also a just estimate of the real disclosure of the original specification and of the amendment of it, and

the claims is based on the fact that what Fessenden invented, disclosed, and claimed from the beginning was a method that effectively fulfilled its purpose at the receiving station. For without forestalling what his disclosure was, or what his original claim covered, we limit ourselves to quoting its language:

"Having thus described my invention and illustrated its use, what I claim as new and desire to secure by letters patent, is the following: 1. In a system of wireless signaling, *the production of signals* by groups of impulses having a group frequency higher than commercially used alternating current frequencies and within the limits of audition."

His method was "in a system of wireless signaling," and as we have shown that system comprised, and had to comprise, a receiving as well as a sending apparatus, or, as he says:

"Fig. 3 shows an arrangement of circuits for use in sending, and Fig. 4, an arrangement of circuits for use in receiving."

It will thus be seen that the object and limit of the method was, not the production groups of impulses at the sending station, but "the production of signals." Where? Necessarily at the receiving station; and these signals were of such character that when they were produced they were "within the limits of audition." And where was the place of audition? Necessarily at the receiving station. These signals, which were produced and heard through agencies not at the sending but at the receiving station were to be produced "by groups of impulses having a group·frequency higher than commercially used alternating current frequencies." As the object and end of the method culminates at the receiving station—the means to there produce signals, being certain groups of waves, concededly old in themselves—he who says that the real invention was the wave group, and not the production of signals, asserts what the specification, the illustration, and the claim contradict.

Turning now to the method patent, we are naturally brought to a consideration of the underlying element of that claim as originally made, viz., "groups of impulses having a group frequency higher than commercially used alternating current frequencies." Impulses having a group frequency were well known in wireless telegraphy from the first; indeed, it may be said that the recognition and utilization of group frequency is the foundation of wireless transmission. Generally stated, that art is thus practiced. At the sending station are suspended wires called "antennæ," from their resemblance to those sensitive organs of insects. These wires are charged or excited by electric sparks in rapid succession. Each electrical charging of such antennæ, which may be likened to an electric blow, causes a rupture or agitation in the surrounding ether, with the result that a group of ether waves radiates from the antennæ as water waves radiate when a stone is thrown into a pond. But these ether waves radiate at the speed of solar light, viz., circling the globe 7½ times in a second. The theory that electricity, like light, traversed space through the medium of ether, and that disruptive discharges caused radiating waves, was advanced about 1865 by an Englishman, Prof. Maxwell, of Cambridge Univer-

sity. The correctness of this theory was later demonstrated by a German, Heinrich Hertz. He devised apparatus consisting, inter alia, of a radiator, and a receiver equipped with rods having small metallic knobs on the ends, and separated a short distance from each other. In this gap were produced the radiating waves foretold by Maxwell, but which were thereafter named for their practical producer, Hertz, as the Hertz or Hertzian waves of modern science. The radiation of these waves through ether is independent of weather or wind; they penetrate all nonconducting substances and reach points below the horizon. When they strike upright conductors, such as the sensitive antennæ of a receiving station, a portion of their energy is cut out and generates therein high frequency electric currents of minute power. Without entering into details it suffices to say that the effect of the electric blow on the sending antennæ is similar to the effect of a blow on a tuning fork, in that it causes the antennæ to emit, not a single wave, but a series of waves of decreasing amplitude, and, like a pebble dropped in a pool, each spark causes train puffs or groups of electric waves to be radiated. It will also be understood the succession of sparks or electric blows, and therefore the succession of groups of waves, continues as long as the sending operator's key is depressed When these emitted waves reach the receiving antennæ they set up oscillation of relatively feeble intensity, but of the same frequency as the oscillations which produced them at the sending station. Led through a detector, they are able to measurably affect a receiving telephone. But even if the telephone diaphragm were set in responsive vibration to the received oscillation, the rate of vibration would be inaudible because the ear receives no impression from a wave frequency above, say 20,000 vibrations a second. Nevertheless, while this would be the action of the telephone diaphragm in response to each particular wave oscillation, so to speak, such diaphragm would flex or buckle in response to groups of these waves as a whole. The result would be that these groups or pulses of waves make themselves audible while wave oscillations do not. Now as these electric waves can be readily differentiated by simple working changes in the sending apparatus, it follows that by corresponding tuning in the receiving apparatus, there would be no trouble in intelligently transmitting messages if there was no interference by other stations, or by static electricity. By tuning or harmonizing the rates of vibration of the electrical currents in the two stations, the receiving would electrically respond to the sending. But with static or station interference, receiving antennæ, which are sensitively ready to receive and respond to all other electric waves, vibrate in various other ways at the same time. This undesired and interfering excitation of the antennæ affects the receiving circuits, which also respond to any excitation in the receiving antennæ. The resultant difficulty is clearly stated by complainant's witness Pickard, as heretofore quoted.

From this consideration of the term "groups of impulses," we next turn to inquire what were "the commercially used alternating current frequencies" which wireless telegraphy employed prior to Fessenden's disclosure. When the sending apparatus is adjusted, as used com-

mercially, and in its most effective condition, it is conceded that two sparks occur for each complete cycle of applied alternating current. While there is some proof, to which we will later refer, to the contrary, the weight of the testimony clearly establishes, and we find it as a fact, that up to that time it was customary, in wireless telegraphy, to use 60 cycles and 120 sparks. Thus Dr Arthur Kennelly, Professor of Electrical Engineering at Harvard University, and who has had wide experience as an electrical consulting engineer, says:

"At the date of the application for the patents 918,306 and 918,307, in suit, it was customary, when alternating current generators were employed as sources of electrical energy for exciting the sending mast wire of a wireless station, to employ a machine of the ordinary low frequency used in electric lighting or power transmission. This frequency was 60 cycles per second. When supplied to a spark gap it would tend to produce a spark frequency of 120."

Professor Kintner, one of the complainants, formerly Professor of Electricity at the University of Pittsburgh, and also a consultant of wide experience, says:

* * * It was the practice at that time (1903) to use low frequency apparatus. I recall during my summer at Old Point Comfort listening to the spark of a number of ships that came into the harbor equipped with wireless outfits. Some of these, notably the Prairie and Topeka, had outfits supplied by the Slaby-Arco system, and these spark frequencies were invariably low. I do not recall a single exception to the above statement. Most of the early outfits were small, and an effort was made to economize the amount of power taken by them, and for a given frequency with a given spark length of operation a certain distance of transmission would be affected with a given amount of energy. If, however, the spark frequency was increased with the spark length maintained the same, the amount of energy required would be increased in direct proportion to the frequency; this would necessitate larger equipment, and was generally considered at that time to be the wrong line of development. That is, the tendency was towards a lower frequency than towards a higher one. * * *

"My first personal knowledge of the high frequency resulted from an inquiry that was made of the Westinghouse Company for a high frequency alternator; that is, one of 500 cycles. This inquiry, as I now remember it, came from the United Wireless Telegraph Company, and was made about the year 1908 or 1909. The design of this particular machine did not come in my department, but the designer affected by it, knowing of my having been interested in wireless work, came to me inquiring about the essential characteristics of such machines, as it was decidedly out of the ordinary and very special. I made it my business to inquire at once from some of the engineers of the National Electric Signaling Company of the advantages to be gained by the use of such frequency, and was informed that its advantages lie in the fact that the pure tone of these high frequencies had the property of penetrating through interference and atmospheric disturbances, and produced results far superior to that secured with the low frequency."

To the same effect is the testimony of John W. Lee, an experienced operator, who also says that in 1905 and 1906, the customary spark frequency was 60 cycle. In this connection it should be noted that there is some proof by the defendant of its having installed certain high spark frequency apparatus at the Brooklyn Navy Yard in March, 1905, which it is now alleged was a complete anticipation of Fessenden's subsequent disclosure. As to what use was made in practice of such apparatus, as to whether any high notes enabled operators to read

their messages through static and station interference, is not shown. No receiving operator testified as to their workings. Baldly stated, it is clear to us that if such apparatus was installed at the time and successfully used to produce high notes so as to dominate static and station interference, we would have had the testimony of operators in such quantity and character as would have conclusively disposed of Fessenden's claim of originality. Moreover, if such results were secured by the government from this Brooklyn Yard installation it is highly improbable that the government's electrical bureau and its operators as well would not, some months later, have made, as we shall see they did, Fessenden's "new spark"—which they "had never heard before"—the subject of report and inquiry. Indeed, that wireless telegraphy as then practiced was kept within such spark frequency limit was imperative, in view of the aural physiological theories then held in the scientific world. The nature of these theories is well illustrated by patent No. 824,682 to Blondell, hereafter noted, where when higher frequency was suggested the patentee coupled it with a selective, resonant, receiving system, tuned and responsive to such high frequencies. It was, of course, known, and is indeed self-evident, that higher group frequencies produce higher and shriller tones. But with the mistaken scientific theories which then prevailed, any one contemplating the use of such high group frequency would have been deterred from employing them. For, by such theories, it would have followed that a use of such high group frequency would only have increased existing confusion. From the mistaken aural theories then accepted by the scientific world, Fessenden departed with an originality that marks him as a pioneer. He not only blocked out a new path, but in a field which was not deemed available. Perhaps no clearer statement of the nature of this departure occurs in the record than in the language used by Fessenden himself in an explanation made by him to the patent authorities while prosecuting the patents now under consideration. He there says:

"In 1905 and prior thereto, I made a number of experiments which seemed to demonstrate that the view held by the scientific world generally, including such eminent authorities as Lord Rayleigh, to the effect that the ear was equally sensitive to all frequencies, was incorrect. That by means of special apparatus and special methods invented by me * * * I discovered that the sensitiveness of the ear increased to a very great extent for frequencies above those heretofore used in wireless signaling, and reached a maximum at about 920 impulses per second, and thereafter began to decrease. * * *

"Within a year after the filing of the present application, serial No. 381,732, this increased physiological effect was also independently discovered and confirmed by Lord Rayleigh, and published by him in the Philosophical Magazine."

In his specification as originally filed Fessenden likewise said:

"In experimenting with a high frequency alternator having a frequency of 80,000 in order to determine the integrating effect of certain types of receivers, it was noted by me that when the trains of waves were broken up into different lengths, when the trains succeeded each other at a *frequency above the normal frequencies used for alternating current work, the signals became more distinct in the presence of atmospheric disturbances.* It was noted, for example, that in a specific case where it is impossible to determine whether the experimental station was sending or not when the sparks succeeded each

other at a frequency of 250 (being generated by dynamo of approximately 125 cycles per second), yet the signals could be easily read when the spark frequency was raised to 900. I discovered and experimentally determined that the main reason for this was a physiological phenomenon; i. e., that when the higher frequencies were being used for signaling the attention of the hearer was concentrated on the higher notes to such an extent that the lower noises made by atmospheric disturbances ceased to affect the consciousness. On the other hand, when the sparks were produced by alternating currents of the usual frequency it was impossible to concentrate the hearing upon the signals, and reception could not be accomplished.

"This physiological effect was found by experiment to be so marked that messages could be read with the greatest of ease at a spark frequency of 900 per second, when at a spark frequency of 250 per second it is impossible to tell whether the station was sending or not, although with the same setting, at a time when there is no atmospheric disturbances, both sets of signals were as measured by shunt on the telephone of equal strength."

Confirming this, Dr. Kennelly says, and we find nothing in the record to contradict his statement:

"Lord Rayleigh, an eminent scientific authority, had published in the Philosophical Magazine of 1894 (volume 38, p. 365), some experimental observations, tending to show that the sensitiveness of the ear was roughly about the same over the range of frequency from 256 to 512 acoustic vibrations per second, indicating that the sensibility of the ear did not vary markedly in frequency or pitch of sounds reaching it. In the Philosophical Magazine of 1907, however (volume 14, p. 596), or about two years after the research date in applicant Fessenden's affidavit, Lord Rayleigh published a new series of observations which superseded the earlier ones, and which went to show that the sensitiveness of the ear increased very markedly with acoustic frequency, at least up to 500 cycles per second, and probably up to 1,000 cycles per second. *It is this greater sensibility of the ear to a sustained high pitch, when mingled with relatively louder sounds of lower general pitch, that is the essence of the utility of the inventions disclosed in the United States patents in suit, 918,306 and 918,307. This differential sensibility of the ear was not scientifically established in 1905.*"

Standing alone as a mere scientific fact, Fessenden could no more have obtained a patent monopoly for such abstract idea than could Lord Rayleigh have done for the discovery of the same truth two years later. Valuable as the independent discoveries of these two independent thinkers were, they did not come within the range of patent protection; for, so far as practical utilization was concerned, the discovery was like gravitation, or any other law of nature. Rayleigh stopped, so far as the record shows, with the discovery and disclosure of the truth, but Fessenden at once proceeded to utilize in wireless telegraphy this newly discovered truth in a way it had never been used before, viz., by the conjoint co-operation of a high group frequency transmitting station and a receiving station with a nonresident receiver. The result of such practical use he disclosed at length, as we have seen in his original specification. So far as the proofs show we agree with one of complainant's witnesses who testified:

"So far as I am aware the applicant Fessenden was the first to apply a high frequency alternating current generator to wireless signaling, and the first to discover that when using a telephone receiver in a receiving system not resonant to the group frequency, there was a great advantage secured by separating acoustically the signaling tone from disturbing sounds."

Waiving the question of who originated the process, there can be no question under the proofs of the marked advantages resulting from

such combination of high frequency transmission with nonresonant reception. That it brought into the wireless field notes hitherto unused in that art is clear. That such notes were of such a unique, insistent, and dominating type that they overmastered and eliminated the audible character of all other static and other station interference is equally clear. Indeed, both the new and the dominant character of this note is strikingly illustrated in the proofs. On the night of December 11, 1905, Fessenden's company, for the first time, sent out from its station at Brant Rock, Mass., high frequency group sparks, produced by newly installed apparatus. The novelty and efficiency of the spark on the receiver at San Juan, Porto Rico, presumably the ordinary nonresonant receiver in common use, was such that eight days later the Bureau of Equipment of the United States Navy began a search for the new phenomenon in wireless telegraphy. On December 19, 1905, that bureau wrote Fessenden's company as follows:

"The operator in charge at San Juan reports as follows, on December 11th: 'At 9:15 P. M. heard a new spark. Had never heard it before. Was making signals "Boz" and kept repeating "Boz" in the Continental Code. Caught the words "Spark—do you get it? How does our spark sound?" At 9:52 the same station repeated the following message several times, "Metallise wire receipt of these messages." ' The bureau would be pleased to know if any of your stations were sending the above at the time given, and what station it was."

To this Fessenden replied on December 22, 1905:

"Sir: Replying to your letter of December 19th, I would say that the messages received at San Juan were sent out from our station at Brant Rock. I inclose report of messages sent out December 11th. The reason for the operator stating that he heard a new spark is because on that night we sent for the first time on a new selector which gives a spark of a different sound from the old selector. We inclose report. I would say that the amount of radiation sent out with the new and old selectors is practically the same, but the new selector gives a clearer pitched note. This company would be pleased to learn what the strength of the signals was as received at San Juan."

Without quoting, in extenso, the correspondence arising from this incident, we add an extract from a letter of July 2, 1906, to Fessenden, from the above operator at San Juan, who says:

"I was pleased to receive your letter of May 29th and note what you say. I think you have the best spark of all I have heard, as it penetrates the static when others fail. I held you one night when Marconi on Cape Cod, Key West, and all was cut out by static. I should like to ask if it will be allowed what cycle do you use? and what K. W. at BO. As near as I can test by sound it is the key of A natural in the music scale, against D sharp an octave lower in 60 cycle, which is very near the tone of static. I should like some information about your system."

This estimate of the value of high group frequency spark is confirmed by other wireless operators. Thus, referring to high frequency sparks of 1,000 a second, one operator says:

"One advantage is its high, clear note. Another advantage, it is an unusual sound, and one which will fix the attention immediately. * * * It also has a tone very different from that of atmospheric disturbances. Atmospheric disturbances give off a noise which is similar in tone to that of thunder, and Mr. Pickard's explanation of it is that it is similar to the sound made by throwing gravel against a window, only the tone of it is lower.

A high spark frequency could be described as a high whistling note, and is piercing. A good explanation of that is the difference in the noise made by a typewriter bell and the noise made by the keys. The noise made by the bell does not necessarily have to be of greater volume than that made by the keys in order to be audible. * * * If the commercial machines are of approximately 60 cycles, which they mostly are, the tone of the interference from them will be similar to that of the atmospheric disturbances above mentioned. * * * I should say it was very important to have a high spark frequency. It is necessary to have it that way because outside disturbances are, as a rule, of a low tone, and the high frequency spark is of a high tone, and on account· of their being so different, it is possible to read the high frequency spark when it is not possible to·read one of a low frequency."

Another operator says:

"The high spark frequency gives a high pitched note, which is readily distinguished from the ordinary disturbances such as static atmospheric and commercial stations or other stations using somewhat lower frequencies. This spark is also easily heard through the noises incidental to the running motor generator set, or the noise made by operating a typewriter in copying these signals."

A third says:

"In trying to read a low frequency spark during a period of static disturbances, it is very difficult, depending merely upon the intensity of the signal, to distinguish it from the static. On the contrary, in reading a high frequency spark, there is such a vast difference in their tone—that is, the tone of the static and the spark—that the signals are practically unobstructed and more easily read through the static than the low frequency spark."

A fourth says:

"In my experience the sounds of the telephone made by static disturbances are usually of a low pitched rumbling character, broken up by sharp snaps and clicks, and are altogether very different from the high musical note produced by a signal of 1,000 sparks per second. This high tone corresponds very closely in pitch to the second C above middle C on the musical scale."

The contrast between the dominant character of a note produced by sparks of high frequency and static and its difference from those produced by low group frequency apparatus is testified to by Dr. Kennelly, who says:

. "If the group or spark frequency was down as low as 250 per second, or less, the sound due to lightning merged with and disturbed the sounds due to signals, so that the receiving operator could not separate them in his mind, and became confused. The sounds due to lightning, I may say, have no single or particular frequency. They may be described as producing noise rather than musical tones, in an ordinary telephone receiver, but the noise is of such a growling quality, or relatively low and scattered range of pitch, that group frequencies of 250 per second or less, with the low tones they produce in the· receiving telephone (middle C or lower) cannot clearly be distinguished therefrom. On the other hand, the high note in the receiving telephone produced by a high group frequency is of such a character that the ear can readily distinguish it from the rumble, splash, and chatter of lightning disturbances."

And, from another aspect, Pickard, an experienced investigator and operator says:

"A further advantage of this method of wireless signaling is that, even in the absence of atmospheric or electrical disturbances, many wireless receiving stations are unavoidably placed in noisy locations. On shipboard, for example, the operating room is filled with noise from the dashing of the waves about the hull, passengers talking outside the door, the creak of the woodwork

of the vessel and a hundred and one other noises. I have personally noted that under these conditions it is often practically impossible to concentrate the attention upon signals from wireless stations of the ordinary character, while it is an easy matter to read messages from stations equipped with apparatus for the carrying out of this method."

Indeed, the literature of the art recognized the benefits accruing from high spark frequency, and this fact and that the credit thereof was due to American advance, is shown in an article in the London Electrician of June, 1909, quoted in the proofs:

"A great change has been taking place during the last few years in the domain of wireless telegraphy, with the result that improvements have been made in two directions, namely, an increase in the range and a considerable improvement in the certainty of working, with which also is included a greater freedom from disturbance. Both improvements have arisen from work that has been done in the United States, and both are due to two very simple technical facts. The first is the abolition of a coherer as a detector in the receiver's circuit and its replacement by an integrating detector. The other is the increase in the impulses in the secondary spark in the sender."

That this latter advance, conceded to have come from the United States, was justly attributable to any particular person other than Fessenden the proofs do not show, and that Fessenden was entitled to it is stated by Dr. Kennelly, who says:

"The second improvement here referred to is the increase in group frequency, forming the gist of the disclosures of the patents 918,306 and 918,307 in suit, in conjunction with nongroup resonant receiving systems and telephone indicators."

From the proofs before us we have reached the same conclusion that the process of the patent was first disclosed by Fessenden.

It is contended, however, that such process is a mere aggregation, that it consisted merely in increasing the speed of existing apparatus, which, as we have seen, was 60 cycle, and that it involves no patentable combination or inventive disclosure. But assuming that 60 cycle machines could have been speeded to 480, and that that would have affected the validity of the patent, such was not the fact. In that regard the proof by one witness is:

"High frequency alternating current generators were very rare and expensive. It would not have been safe to attempt driving a 60 cycle alternating current generator at eight times the normal speed in order to obtain 480 cycles per second frequency, because the centrifugal forces varying as the square of the speed would be increased 64 times above normal."

Another witness testifies:

"A motor generator of less speed could not be speeded up and increase the spark frequency of the oscillating circuit to any degree of increase. These motors are designed to run at a certain predetermined speed by the manufacturers, and are not readily changed without materially changing their construction."

A third, who had both theoretical and practical training in the art, says:

"Special high frequency alternators, not in commercial existence, had to be developed for the purpose of this invention. In fact one familiar with the theory and practice of wireless telegraphy, in the absence of actual trial of this method, would naturally conclude that such frequencies as 1,000 per sec-

ond would be disadvantageous. I was personally of this opinion until shortly after the date of the filing of the above patent Professor Fessenden disclosed, this method to me and its remarkable operativeness."

So, also, Professor Kintner says, as previously quoted:

"My first personal knowledge of the high frequency resulted from an inquiry that was made of the Westinghouse Company for a high frequency alternator; that is, one of 500 cycles. This inquiry, as I now remember it, came from the United Wireless Telegraph Company, and was made about the year 1908 or 1909. The design of this particular machine did not come in my department, but the designer affected by it, knowing of my having been interested in wireless work, came to me inquiring about the essential characteristics of such machines, as it was decidedly out of the ordinary and very special. I made it my business to inquire at once from some of the engineers of the National Electric Signaling Company of the advantages to be gained by the use of such frequency, and was informed that its advantages lie in the fact that the pure tone of these high frequencies had the property of penetrating through interference and atmospheric disturbances, and produced results far superior to that secured with the low frequency."

Nor does the fact that it was known that high spark frequencies could be used to create high notes detract from the merit of Fessenden's disclosure, for the use of such high group frequencies as was shown, for example, in the patent of Blondell, referred to above, was with a resonant receiving system. But that such combination of high frequency group sending and resonant receiving would not overcome static is clear from the proofs. In that regard Dr. Kennelly says:

"If the receiving telephone apparatus were of such a character as to be resonant to the high group frequency of 1,000 groups per second, then any sudden electrical disturbance due to lightning above a certain strength would inevitably produce a tone of the same pitch as that of the signals, and would therefore be likely to confuse the operator and cause him to make mistakes in interpreting the message. This is for the reason that a tuned or resonant system, whether electric or acoustic, or both, responds eagerly and powerfully to rhythmic impulses of its own frequency; that is, the frequency to which it is resonant. It tends to respond, either not at all, or relatively feebly, to rhythmic impulses of any other frequency. Nevertheless, any single, strong impulse given to the system will cause it to vibrate, and the vibrations will belong to its own pitch. Thus, if a single harp string is stretched in a frame and tuned to a definite frequency, it will readily be set in vibration by sounds in the neighboring air of its own pitch; whereas, it will not vibrate at all, or only very feebly, to sounds of any other pitch. If, however, any strong disturbance, rhythmic or not, reaches the string it will be set in vibration, and the vibration will be that of its own pitch."

Indeed, to us it is apparent that in the proposed use in the prior art of high group frequencies there was no probability of discovering their utility in dominating static, so long as such high group frequencies were used with resonant receivers. On that point it was said by the last-named witness:

"In any such case the lightning disturbances if sufficiently powerful to obtrude themselves, would have the same pitch as the incoming signals, so that the ordinary apparatus of the receiving operator would be incapable of discriminating. On the other hand, in the present application for patent, with the telephone of the ordinary character not selectively tuned to resonance for any one frequency, the receiving operator could readily distinguish the high notes of the signals coming in the high spark frequency from the rattle of atmospheric disturbance, even though the rattle was very loud and the received signals very faint."

To the same effect is the testimony of Lee, who, in answer to the question whether it would be an advantage to use a resonant receiver with high spark frequency, replied:

"No, this would not be an advantage, for the reason that any other signal or interference would affect the receiver, which would respond in the same note and prevent any intelligible signals being read."

It will thus be seen that the prior use of high speed frequency, coupled as it was with resonant receiving, was a misleading hindrance rather than an enlightening help to Fessenden. Its use in that connection cannot therefore justly lessen the originality or patentability of Fessenden's radically different use of such frequency. Indeed no one could have thought of such use in the absence of the discovery of the physiological properties of the ear in relation to high frequencies.

From these considerations it is clear to us that the process shown by Fessenden in his specification was an original disclosure of great merit. The prior trend of the art was to exclude static disturbances, and this centered the hope of improvement in the receiving station. Fessenden's course was that of the pioneer. In substance, he said:

"Your whole theory of aural phenomena is wrong. High frequency will create a dominant and controlling note, and by its use in connection with a nonresonant receiver you may neutralize and overcome the effect of all incoming static influences."

The free admission and absolute neutralization of hostile static influence in wireless system made, in our judgment, a new era in the art. It made the sending station what it should be, the dominant and controlling factor, in the character of electrical transmission, over all other electrical forces in its range; it made the receiving station the recipient of that dominant transmission to the neutralization of all other electric influences. In that regard we think the matter was clearly and fairly stated in the brief of complainant's argument:

"A great many schemes were tried with more or less success before Fessenden conceived the idea set forth in his patents in suit. This new method radically differs from all previous methods in that it contemplated adjustments of frequency at the sending end and not at the receiver, and especially in that it boldly permitted the static disturbances to enter the receiving circuits, and undertook to suppress the evil effects, not by keeping them out of the receiver, but rather by preventing them from affecting the operator's ear, in consequence of what was occurring at the sender. This method was new and entirely different from the wave tuning. It deals mainly with the group frequency, and is dependent upon the definite rate of succession of the spark, and the effect of this rate of succession on the operator's ear. It is based upon Fessenden's discovery that certain supposedly established facts of physics or physiology were not facts at all, but the reverse of the truth; i. e.: (1) That the ear and phone combination was equally sensitive to all audible frequencies of vibration; and (2) that 'high notes are heard with difficulty in the presence of lower ones.'"

It is contended, however, that patent protection for this advance in the art should be denied Fessenden by reason of the proceedings in the patent office during the pending of his application. It is urged: First, that his specification as originally filed did not disclose the invention embodied in the claims now sued on; that it was not until some months later that the element of a nonresonant telephone was disclosed; and

lastly, that the requisite statutory affidavit was not made at the time of these additions. It is therefore contended that under this court's decision in Hestonville Ry. v. McDuffee, 185 Fed. 798, 109 C. C. A. 606, and the kindred cases therein relied on, Fessenden's patents are void. Without entering into a discussion of that case, it suffices to say that it is bottomed on the fact

"* * * that his (the patentee's) amended application and later claims constituted a distinct departure from his prior application, and that the claim in question was wrongfully issued."

But the present situation is radically different. The original specification of the method patent was filed July 1, 1907. We have already seen that in December, 1905, apparatus for utilizing Fessenden's method had been installed at the Brant Rock station in Massachusetts, and Fessenden had been advised of his dominant note neutralizing static disturbances in the tropical station at San Juan. The situation was therefore wholly different from the Hestonville one. Having thus tested and proved his method by practice, having made it public and established its worth, there was every reason why Fessenden should, and none why he should not, disclose it fully, when he came to file his application 18 months later. To say that he did not so disclose and claim, to say further that he did not know himself then, or believe he had made an invention embodying high spark frequency and nonresonant receiving, is a contention, in view of what he was then practically accomplishing, that requires for its support clear demonstration. Turning again to the original application, we must bear in mind that the specification and drawings are addressed to those familiar with the art. Those so skilled, therefore, were advised by the original application: That Fessenden's "invention relates to the prevention of atmospheric and other disturbances, which is its primary object." That "Fig. 3 shows an arrangement of circuits for use in sending, and Fig. 4 an arrangement of circuits for receiving." That "stations equipped with the usual type of apparatus, as a rule, are unable to work at all for months at a time except at brief intervals, and even in the more northern climates the same difficulties occur during the summer months." That "the invention herein disclosed has for its object the annulling of the effects of disturbances and more particularly atmospheric disturbances." That "63 and 64 are telephone receivers." That:

"In experimenting with a high frequency alternator having a frequency of 80,000, in order to determine the integrating effect of certain types of receivers, it was noted by me that when the trains of wave were broken up into different lengths, it was noted that when the trains succeeded each other at a frequency above the normal frequencies used for alternating current work, the signals become more distinct in the presence of atmospheric disturbances. It was noted, for example, that in a specific case where it is impossible to determine whether the experimental station was sending or not when the sparks succeeded each other at a frequency of 250 (being generated by dynamo of approximately 125 cycles per second), yet the signals could be easily read when the spark frequency was raised to 900, I discovered and experimentally determined that the main reason for this was a physiological phenomenon; i. e., that when the higher frequencies were being used for signaling, the attention of the hearer was concentrated on the higher notes to such an extent that the lower noises made by atmospheric disturbances ceased to affect the

consciousness.   On the other hand, when the sparks were produced by alternating currents of the usual frequency, it was impossible to concentrate the hearing upon the signals and reception could not be accomplished.

"This physiological effect was found by experiment to be so marked that messages could be read with the greatest of ease at a spark frequency of 900 per second, when at a spark frequency of 250 per second it is impossible to tell whether the station was sending or not, although with the same setting at a time when there is no atmospheric disturbances both sets of signals were as measured by shunt on the telephone of equal strength"

and finally:

"Having thus describes my invention and illustrated its use, what I claim as new and desire to secure by letters patent is the following: (1) In a system of wireless signaling the production of signals by groups of impulses having a group frequency higher than commercially used alternating current frequencies and within the limits of audition."

To our mind it is clear that to those skilled in the art, these statements and illustrations clearly disclosed Fessenden's proposed method to be the use in the wireless system of group high frequency with a nonresonant receiver. It is true the word "resonant" was not used, but such were the receivers in the "stations equipped with the usual type of apparatus." It was such apparatus to which the application referred, and it likewise showed experimental and successful use in such stations in working the method; and the claim, as we have seen, was "in a system of wireless signaling" which necessarily embodied, as the specification stated, both sending and receiving stations; the object was "the production of signals," and these signals, to be effective, must necessarily be produced at the receiving station; they were to be "within the limits of audition." It is therefore clear that if the patent specification had stood as originally made, and the single broad, inclusive claim of Fessenden been allowed, it would have been infringed by one practicing the method embodied in the claims, subsequently allowed, which are here involved, and this fact shows that the subsequent amendments made and claims allowed were not, as in Hestonville, a "departure from the prior application." And this becomes the clearer when we consider why the amendment was made and the claims changed. This was done, not from the choice of the applicant, but at the insistence of the office and over the protest of Fessenden, who always stood on his right to the original claim, putting on record, as he did, the statement that "in changing the claims therefore, it is not intended to admit that the original claim was met." Turning to the file wrapper, it seems the original claim was rejected on Blondell, No. 824,682, granted June 26, 1906, on the ground it "disclosed transmitting oscillators of a group frequency of 900 per second." That such was the fact is clear from the Blondell patent, but it is equally clear that Blondell's use of a high group frequency was not an anticipation of Fessenden's method, for both in its specification and claims it showed a resonant receiver, a device which would be fatal in Fessenden's method. For as we have seen, and in the then state of aural knowledge, it would have been regarded as destructive to have coupled such high spark frequency with nonresonant receiving. Indeed, that Blondell's device, with its resonant receiver, was of a fundamentally

694 208 FEDERAL REPORTER

different type from Fessenden's is clearly proven. To shift the signaling note to a higher plane of frequency, and then by a resonant receiver produce that same tone whenever the receiver was excited by atmospheric disturbance, would have increased, instead of eliminated, confusion. In that regard, a practical and experienced operator, referring to a receiver so adjusted as to resonate to the group frequency of the electro magnetic waves carrying an incoming message, says:

"My experience has been that if the receiving signal was exceedingly loud it would respond, provided there was no atmospheric disturbances or other stations that were louder. * * * Outside interference will always cause the resonator to give off the same tone. It is very difficult to prevent disturbances inside of the room from causing the resonator to respond to those noises, and all interference will cause it to respond to the particular tone to which it is tuned, irrespective of the tone of the interference. * * * I have experimented with these (group responsive on resonating receivers). I have found them impractical on account of their responding to interference, which always gives off the same tone as the signaling tone. Having the same tone, it is impossible to distinguish between them."

To the same effect is the testimony of another operator:

"Q. The receivers you have used in operating the higher spark frequency method in commercial apparatus, were they resonantly responsive to the spark or group frequency, or not? A. No, they were not. Q. Suppose the receiver was resonantly responsive to the group frequency of the waves being sent while you were receiving the message, would this be an advantage or a disadvantage, and why? A. No, this would not be an advantage, for the reason that any other signals or interference would affect the receiver, which would respond in the same note and prevent any intelligible signals being read."

Blondell's process being directed to resonant and Fessenden's to nonresonant receivers, it will be seen that the former's work threw no light on the latter's problems. But as both were using high group frequency, the department properly held that in view of Blondell's use of high group frequency in connection with resonant receivers, Fessenden should restrict himself to nonresonant receivers. It, therefore, came about that Fessenden, as his application proceeded, was constrained to embody in his claims the express description, "and receiving the same with an indicator resonantly unresponsive to said group frequency," and to define "resonantly unresponsive" "to mean an indicator which on being affected by a periodic impulse does not emit a note of the group frequency being used." It will then be seen that the claims allowed, and which are here involved, and which read as follows:

"(1) In the art of wireless signaling, the method of eliminating disturbing impulses which comprises generating waves having a definite frequency, in groups having a definite group frequency above 250 per second, but within the limits of audibility, and receiving the same with an indicator resonantly unresponsive to said group frequency,"

"(3) In the art of wireless signaling, the method of eliminating disturbing impulses which comprises generating waves having a definite frequency, in groups having a definite group frequency of approximately 1,000 per second, and receiving the same with an indicator which is unresponsive, resonantly, to said group frequency"

in no sense depart from the disclosure originally made; but the specific element of the receiver resonantly unresponsive only served to clearly differentiate Fessenden's method from Blondell's apparatus, and justi-

fied the office in issuing the thus more clearly defined claims now be-fore us. Indeed, since the office acquiesced in the contention that with the amendment of Fessenden's claims so as to embody a resonantly un-responsive receiver, Blondell's patent ceased to be a pertinent refer-ence, it would seem that had Fessenden originally confined his applica-tion to the claims as finally allowed, they would have been granted without question. The whole course of procedure shows that the claims thus finally allowed were germane to the broad disclosure orig-inally made, and the case in hand is within neither the letter nor the spirit of the Hestonville case, which was a clear attempt to take advan-tage of the art made during the nine intervening years of a virtually abandoned application.

Holding then, as we do that the claims in question, of these two patents, Nos. 918,306 and 918,307, are valid, the weight of the evidence clearly satisfies us of the infringement thereof by the defendants.

[2, 5] It remains to consider patent No. 928,371 to Fessenden for signaling by electro magnetic waves. The specification says it is ad-dressed "to provision for tuning the circuits in apparatus" for wireless telegraphy. Generally speaking, tuning such apparatus consists in bringing two or more electrical circuits into resonance. Every elec-tric circuit has a natural vibration time of its own, and tuning such circuits consists in giving time-period vibration identity to them. This is well stated in the U. S. Navy Manual:

"By tuning is meant the adjustment of the closed and open sending cir-cuits to the same wave lengths and to any desired wave length within their limits. The wave length assigned to a station might be called its tune."

The principles as well as the electrical agencies used in tuning were, prior to Fessenden's patent, well known. Substantially they might, in a general way, be thus enumerated. Every electric current has a natural period of vibration of its own. Any circuit having capacity and induction can be tuned, provided the resistance of the circuit is less than twice the square root of the inductance divided by the square root of the capacity, and tuning involves the adjustment of capacity and inductance to secure the wave time period or wave time length de-sired. It will thus be seen the subject-matter of this patent, which all parties agree is wave length, involves a distinctively different field from that of group frequency to which the patents of Fessenden, previously discussed, are addressed.

The basic English patent to Marconi, No. 7777 of 1890, and as well those of an unusual number of later patentees, involved tuning. The field of inventive effort in tuning was therefore narrowed when Fes-senden applied for his patent. His specification is vague, if not in-deed veiled, so far as enlightening disclosure is concerned. It recites no existing difficulties in the tuning branch of the art, and shows no obstacle or fault which Fessenden's devices overcome. It disclosed no specific, averred improvement he was making. It is of course true that his various claims showed combination of certain elements to effect tuning, but in what respect they were an advance over prior practice, wherein they were novel, useful, or inventive, the specification does not show. Indeed, it seems to us, the call for clarity was all the

greater by reason of the occult nature of the art involved. . The whole specification evidences a noncompliance with the statutory requirement, viz., a disclosure in

"* * * such full, clear, concise and exact terms as to enable any person skilled in the art or science to which it appertains * * * to use the same."

In this respect one of defendants' witnesses, himself skilled in electricity, well says:

"There is no statement of invention in the specification, nor any statement of what are the essentials of the thing described and shown; the nearest to it we find is the statement that the supposed improvement 'relates' to 'provision for tuning the circuits,' and that he provides 'a capacity and induction in shunt to each other' in the aërial circuit, and 'a receiver in operative relation to the condenser and inductance circuit.' The claims are all based on this."

Moreover, it is to be observed several different wireless systems effect the tuning of receivers to wave frequency by various methods, different in detail, but all involving electrical tuning by combinations of inductances, of coils and capacities of condensers, involving various arrangements of the circuits. So that at most, as we view it, this patent No. 928,371 of Fessenden is but one of this general type of detail modification of the receiver in circuit.

Without further protracting this opinion by a discussion of these details, we content ourselves with stating that the proofs, the brief, and the oral discussion of complainant's counsel have failed to satisfy us of the inventive character of anything disclosed by Fessenden in this patent. We accordingly hold it invalid.

Passing from these questions of invention to those of a legal character, it will be noted that four patents, all in the art of wireless telegraphy, were originally embraced in this suit. One has since been withdrawn, leaving for consideration Nos. 918,306, 918,307, and 928,-371, which we have discussed. The bill was filed on September 17, 1910, and the sole plaintiff was then the National Electric Signaling Company, the assignee of the patents; the other two plaintiffs having come upon the record in December, 1912.

[3] The first matter that challenges attention is the defendant's objection that the signaling company acquired no title as assignee until August 19, 1910, and therefore—since the acts complained of as infringements were committed before that date, and of course before the title passed—the company itself could not have recovered in the present proceeding, nor can the other plaintiffs who depend on the company's right. As noted above, we regard No. 928,371 as void for lack of invention, and for this reason we need not inquire into the right of the signaling company to sue for its infringement.

With reference to Nos. 918,306 and 918,307, the facts are as follows: These two patents issued to Reginald A. Fessenden on April 13, 1909, and on May 1, 1909, Fessenden executed an instrument wherein he did

"* * * hereby sell, assign, and transfer unto said National Electric Signaling Company, its successors and assigns, the entire legal as well as equitable right, title, and interest in and to the said patents Nos. 918,306 and 918,307 and the inventions therein set forth, * * * and in and to all rights of ac-

tion under said patents, and in and to all claims for past infringement of said patents, for its sole use and behoof," etc.

This instrument, although dated May 1, 1909, was not acknowledged until August 19, 1910, and therefore the defendant contends that no title passed to the company until August, and that acts of infringement committed before that date could only be redressed in a suit by Fessenden. If this contention were sustained, it would still be necessary to decide to what point of time in the "past" the assignment of "all claims for past infringement" refers—whether to August, 1910, the date of acknowledgment, or to May, 1909, the date of execution. But we need not consider this clause at all, for the question whether the title to the patents passed in May or in August is not open for discussion in the third circuit. It was settled in Murray Co. v. Continental Gin Co., 149 Fed. 989, 79 C. C. A. 499, where this court held that the acknowledgment of an assignment is merely an alternative method of proving the instrument, and that title passes at the date of execution and delivery. There is no evidence that the assignment now in question was not executed and delivered on the day of its date, May 1, 1909, and therefore in our opinion the complete title passed at that time to the signaling company, carrying with it the right to maintain the present bill, wherein acts of infringement after that date are alone complained of.

[4] But while the suit was in progress the signaling company encountered business troubles, and on July 26, 1912, the United States District Court in New Jersey appointed Samuel M. Kintner and Halsey M. Barrett as receivers. They duly qualified, and on December 18th of the same year, having obtained permission from the District Court for the Eastern District of Pennsylvania, they filed a supplemental bill in the suit brought by the signaling company. In this pleading the receivers averred that they had acquired the entire right, title, and interest to the patents, together with the right to sue for past, present, and future infringements thereof, and that they were entitled to come upon the record and take charge of the proceedings on behalf of the signaling company. The defendant denied these averments, and the receivers' right to maintain the suit is therefore before us for decision. The relevant action of the New Jersey court was as follows: On July 26, 1912, the court appointed Kintner and Barrett

" * * * receivers of all and singular the lands, tenements, and hereditaments of the defendant, and all of its real and personal property, business, shares of stock, rights, patents, applications for patents, inventions, assets, and effects of whatsoever nature and kind, wherever the same may be situated, including all of its contracts, rights, and choses in action and other corporate rights and franchises, and its income and profits."

The court also authorized the receivers

" * * * to take possession of all and singular the properties, business, and assets above described and referred to, wherever situated or found;"

and clothed them with

" * * * full power to demand, sue for, collect, receive, and take into possession, all the goods and chattels, rights and credits, moneys and effects, lands and tenements, books and papers, choses in action, bills, notes, and

property of every kind and description of the said defendant company, and to institute and prosecute suits at law or in equity for the recovery of any asset, property, damages, or demands existing in favor of the said defendant company, and to· defend any and all suits," etc.

Still further, apparently in order that there might be no room to question the receivers' right to step into the shoes of the signaling company as completely as possible, the court directed the company forthwith to

"* * * transfer, convey, turn over, and deliver to the receivers, or their duly constituted agents or representatives, all the real and personal property, business, assets, and effects above described or referred to, and all the property and assets of the defendant company, and all books of account, vouchers, deeds, leases, patents, applications for patents, inventions, contracts, bills, notes, accounts, moneys, shares of stock, certificates of stock, bonds, obligations, or other property belonging to the defendant company in his, their, or its hands, or subject to his, their or its control."

In obedience to this order the signaling company, on October 24, 1912, executed and acknowledged an instrument whereby it assigned to the receivers

"* * * all rights, title, and interest in and to the patents and the inventions set forth in the patents and applications in the schedule below listed, including the right to sue for past infringement * * * as fully and completely as said rights would have been enjoyed by the National Electric Signaling Company if this assignment had not been made."

The "schedule below listed" includes the two patents now under consideration. We confess to some difficulty in understanding what more was needed to authorize the receivers to intervene and carry on this litigation. Authority to sue was granted by the District Court of New Jersey; and, since this alone might not be sufficient to support the receivers' right to sue in a foreign jurisdiction, the company was required to assign, and it did assign, all its rights in the patents and in past infringements; and the Pennsylvania District Court, recognizing the receivers' title, authorized them to file the supplemental bill in order to utilize the proceedings already taken, and to prevent delay and expense to both parties. It would be a narrow technicality indeed that would require the receivers to begin a new suit and to go over the same ground again that had already been traversed when the supplemental bill was filed. The subject does not seem to need elaboration; the defendant's objection to the receivers' right to carry on the suit is there fore overruled.

In accordance with these views, the decree of the court below is reversed, and the case remanded, with instructions to enter a decree for complainants, sustaining the validity of the claims involved and ordering an accounting.