GENERAL SUBCONSTRUCTION CO. v. NETCHER et al.

(Circuit Court of Appeals, Seventh Circuit. October 5, 1909.)

No. 1,580.

PATENTS (§ 328*) — ANTICIPATION — PROCESS OF MAKING SUBSTRUCTURES OF BUILDINGS.

The Ewen patent, No. 718,441, for a process of making and placing in position substructures for buildings and the like, which consists, instead of making the entire excavation in the first place, "in forming a suitable trench where the exterior wall is to be erected and simultaneously placing in position a lining for said trench from the top downward as the work of forming the trench progresses, then placing braces between the two linings so as to transmit the exterior pressure to the core of earth within such proposed wall, and then erecting within the trench a wall of less thickness than the width of the trench" is for a mechanical process, and, reading the claims in connection with the specification, is not entitled to a construction which would include as a step of such process the use of flexible linings for the trench and their progressive and unequal adjustment by manipulating adjustable and extensible braces to meet inequalities or changing conditions in the adjacent material, and without such construction it was anticipated in the prior art.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the Circuit Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit in equity by the General Subconstruction Company against Mollie Netcher and others. From a decree (167 Fed. 549) dismissing the bill, complainant appeals. Affirmed.

Appellant failed in its suit to enjoin infringement of patent No. 718,441, January 13, ——, to Ewen. (C. C.) 167 Fed. 549.

The description, the claims relied on, and Fig. 2 of the drawings are as follows:

Fig. 2.

"My invention relates to a process of making or producing the substructures of buildings and the like. In the ordinary methods of constructing buildings the excavation is first made to the desired depth. Some kind of temporary retaining structure is put in position about the place where the excavating is going on. Obviously this involves great difficulty and danger, and if the buildings surrounding the place to be excavated are heavy, or if the excavation is deep, injury and accident are certain to take place, and the cost and delay involved in proceeding in this manner are certain to be great. When the excavation is completed, the foundations are laid both for the retaining walls to hold up the surrounding property and for the columns and the like which are to receive the weight of the building to be erected above. The increase in value of real estate is such that there is a strong tendency to build, not only basements, but subbasements, to a depth of several 'stories,' so to speak. According to the old method, when the excavation has been completed, the foundations are laid, and then the structure begins to rise story by story from the bottom, until it reaches the street level. In other words, the process of erecting the substructure is exactly the same as the process of erecting the upper portion of the building. I use the earth which forms, so to speak, the 'core' within the retaining wall of the substructure, to support and sustain the various pressures as the work progresses. I have shown diagrammatically, as it were, the application of my process in the drawings, wherein—

"Figure 1 is a vertical section, showing the work of producing a portion of the substructure partially completed. Fig. 2 is a similar view, wherein the work has progressed farther. Fig. 3 is a similar view of the completed work. Fig. 4 is a horizontal section, showing the work in various stages of progress at different points. Fig. 5 is an enlarged detail section of the exterior retaining wall complete.

"Like parts are indicated by the same letters in all figures.

"A, A, are the beams and columns of the original building; A', the floor: A², the column foundations; A³, the curb wall (shown in dotted lines), and A⁵, the sidewalk. (Shown in dotted lines.)

"A⁶ is the basement-space.

"The first step which I take in applying my invention is to remove the curb wall and, perhaps, the sidewalk, though the latter may be shored up and held in position in any desired manner when its supporting curb wall is about to be removed. I now in lieu of such curb wall erect a support, B, which I hold in position by means of the struts, B', B'. The work to this point is of the usual type. I begin to dig a trench along the line where the exterior retaining wall is to be placed. This trench I indicate by the letter C. As the excavation of this trench proceeds, I place upon each side of its walls heavy retaining planks, C', C², and hold them in proper position by means of a series of jack-screws, C³. The retaining boards may be of any length, size, or shape. The number of jack-screws will be varied. When the first one has been placed in position, I make another excavation—say one foot deep—in said trench and place another set of boards with the proper number of jack-screws. Thus I continue the work until the trench is dug the desired depth. I now place in the bottom of this trench a footing, C⁴, preferably of concrete. It will be understood that as much or as little as may be convenient of such trench may be dug out at one time, or the entire trench all the way around the proposed building side may be simultaneously excavated. I now place permanent I-beams, C⁵, vertically in the trench, putting them along at proper intervals, as indicated in Fig. 4, and preferably between the jack-screws, C³. With each of these I-beams I associate a series of short jack-screws, C⁶—one on each side of the beam and bearing, respectively, against the boards, C', and C². As this work is carried forward, it is obvious that the jack-screws, C³, can be removed, as indicated in Fig. 4. The connection at the corner may be made in various ways. I have illustrated one form.

"D is the short board placed diagonally across the corner; D', a block on which rests the longer jack-screw D², the other end of which rests upon the cross-block, D³, in the exterior corner of the trench. Obviously up to this point the conditions of stress and pressure between the earth exterior to the proposed building and the core of earth on the site of the building are prac-

tically undisturbed, and whatever weight there was on the exterior—as, for example, the weight of some building—is properly sustained against the core of earth within the building side. The pressure is taken up by the jack-screws, and then by the shorter jack-screws, which act through the vertically arranged I-beams. The space between the I-beams is now filled with concrete, E, in any desired manner, so as to form an exterior retaining wall of steel and concrete, and this wall may surround the entire building site.

"I now proceed to make the excavation for the columns. This I do by boring through the earth and retaining the earth in any desired manner—as, for example, by means of the rings, F. F. These rings may be associated with vertical stays or utilized in any manner to hold the earth against the pressure which may be applied to it from any source. This work is carried down to preferably the solid rock, or until at least a proper foundation is obtained. The bottom of this hole is then properly filled with concrete, F', and the column footing, $F^2$, is placed in position. A column, $F^3$, is now inserted in this hole within the rings, and it is supported upon the concrete, F', and the footing, $F^2$, in proper manner. In cases where, as here illustrated, the substructure is two or three or more stories in depth, the column must be properly supported or stayed, because it is intended to or may carry a considerable load before the excavation is made, as hereinafter explained. This I do by throwing out from the column at suitable intervals supports against the inner walls of the rings. These supports may be short jack-screws, $F^4$, $F^4$, and they may be arranged as frequently as desired, but should be placed in proximity to the horizontal line of each proposed cross-beam, so as to give the column suitable strength against any tendency which it might develop to buckle under a load. Having proceeded thus far, it will be possible to begin the upper structure, and this is done by forming the first horizontal floor support. This is done by putting in position the I-beams, G, G', $G^2$, and the like, and suitably attaching them to the upper end of the exterior vertical I-beams, $C^5$, and to the columns. Obviously prior to this action the columns and beams, A, floor, A', and footing, $A^2$, of the old building will have been removed. A little further excavating will uncover one or two of the upper boards, C', and the second layer of floor supports are now put in—for example, beams, $G^3$, $G^4$, $G^5$—and they are properly attached to the respective columns and to the exterior retaining wall. These beams will form the floor of the basement. The earth for the subbasement may now be removed; the parts being sufficiently supported by the beams, columns, and retaining walls, which are bolted together. Of course in this process the upper boards, C', with the inner short jack-screws, $C^6$, will be removed. This process of excavating will continue until the floor line of the subbasement is reached, when the supports for such subbasement floor will be placed in position. These beams are indicated by $G^6$, $G^7$, $G^8$. They are in like manner bolted to the exterior walls and the columns. In the same manner the cellar excavation is made, and the floor of the cellar, $G^9$, can then be placed in position. Thus there will be constructed within the retaining wall, but securely supporting the same by reason of the lateral beams, a steel structure, which will constitute the substructure of the building, and which will be entirely surrounded, if this be desired, by a retaining wall of steel and concrete. This retaining wall will be coated on the inside in any desired manner, by cement or the like, at J. Its exterior is also properly coated at J', and then, if desired, is further covered by layers of asphalt, $J^2$. The short jack-screws on that side are then removed one by one, and the space between the boards, $C^2$, and the retaining wall, is filled up with crushed stone, $J^3$, or suitable filling material. Of course, the boards, C', and $C^2$, will be taken out during the process, and the struts, B', will be removed at the proper time. When the whole process has been completed, and the entire structure has been finished, it will be found that there is an exterior wall of vertical I-beams and concrete around the building site, and that it is securely attached to and forms part of the structure of the building. This retaining wall is held in position by the cross-beams and may present a vertical interior face, as indicated, if desired. It may thus be said that the exterior pressure on one wall is balanced, as it were, by the exterior pres-

sure on the opposite wall, by means of the beams, $C^3$, $C^4$, etc. The sidewalk, K, will be properly supported upon the beams, G, and the pavement, K', will be extended out over the vertical layer of crushed stone or filling material up to the sidewalk. In the lower part of this crushed stone or filling material is preferably placed the drain tile, $K^2$, which is connected with the intake, $K^3$, and whence the water which may accumulate in such drain tile may be carried off in any desired manner. It is obvious that this substructure may be carried downward to any desired depth, and that it is a perfectly safe method, because the inner core of earth carries the same load or sustains the same pressure at all times during the process of the work, except as to certain minute areas which are exposed from time to time as the jack-screws are moved. This, however, is a negligible danger, and if there is any shifting of position the new jack-screw placed in position at or near the point from which the old jack-screw was removed can be operated to restore original conditions. These several jack-screws are used because they present adjustable features which permit the work to be adjusted as it progresses, and in the operation of a large building would be constantly attended and operated so as to keep the condition substantially uniform.

"As previously suggested, my process is used in gradually sinking or excavating a trench where the retaining wall is to be placed, and simultaneously supporting the earth to be held up by the retaining wall against the earth within the retaining wall by means of the removable and adjustable jacks. As the trench is deepened, the supporting devices are supplied, until the full depth of the excavation is reached. I now proceed to construct or erect the retaining wall, and its several members, while in process of being assembled, serve as intermediaries between the two masses of earth to transmit the pressure from the exterior earth to the interior earth or core, and thus I practically complete the retaining wall. Such a retaining wall would obviously be insufficient to permanently maintain itself against the exterior pressure when the earth core is removed. I therefore construct within the earth core those parts of my substructure which are to take the pressure from above, and while so doing I support the excavations for such column-like parts, so as to keep the core of earth intact, and I also support the columns within such excavations by lateral stays or struts, so as to prevent them from buckling if any considerable weight should be applied to them. I complete the internal framework of the structure by connecting its horizontal portions from column to column and from the columns to the retaining wall, and as this process continues I excavate the core to make room for such laterally projecting frame members.

"To point out the value and the use of my invention, it is only necessary to suggest that any kind of a retaining wall can be built according to my process. The wall may be thin, as I have indicated, and of uniform thickness, as I have indicated, and may be a dependent wall, as indicated—that is, a wall which is not self-supporting against external pressure. On the other hand, the wall may be of any desired thickness, and of variable thickness, and may be made of any desired materials, and may be a self-supporting retaining wall of the ordinary type or pattern, wide at the bottom and narrow at the top.

"It is obvious that, as previously suggested, the superstructure may be erected on the columns before the substructure is completed, and even, if desired, long before the excavation is completed—that is, the excavating can take place at any time and under any desired conditions. On the other hand, it is equally obvious that these retaining walls and the remainder of the substructure can be erected under a completed building. Thus by the use of my process it is entirely feasible to erect under a standing building which is to be preserved a new retaining wall and a new substructure, and this may be done at any time and without disturbing the occupants of the building above. One advantage in working under an old building in position or erecting the substructure first is that the excavating can then be more conveniently carried on, because of the protection furnished by the superstructure, and because of the ease with which the hoisting and other working apparatus can be attached to such superstructure. Of course, the wall may be wholly or partially completed at any time, and in some instances it may be desirable to have only

a portion of a retaining wall complete according to my system, though when the system is fully applied there should be a retaining wall entirely around the area above which the building is to be erected. I have used the terms 'inside' and 'outside' and other like terms in their ordinary senses, and I have used the word 'core' as applied to the earth within the retaining wall, and, whether the wall be completed or not, it refers to some or all of the earth which lies under the building to be erected, and which receives the external lateral pressure, as described. It will be observed that, as above suggested, this method provides for ample security and makes the work thoroughly safe from liability of injury to adjoining property. At the same time it is evident that there is a great saving of time, both because the work can be begun before the old building is destroyed, or its occupants disturbed, and because in a sense the builder can build in both directions from the floor level at the same time, and because, the retaining wall having been built before the old building is removed, it is possible to proceed at once upon the removal of the old building to the erection of the foundation for the vertical members which are to sustain the superstructure.

"I have shown the application of my process wherein the wall is placed midway between the two trench linings, though, of course, for certain purposes it might be placed at one side, and it might be placed against the inner lining, thus leaving room between the wall and the outer lining for the further carrying out of the process.

"In my description and claims I have necessarily recited the several steps in succession, although it will be understood, and for the most part is obvious, that the precise order of the several steps might be varied without departing from the spirit of my invention, and that some of the steps recited successively might be carried on simultaneously."

"1. The process of making and placing in position substructures for buildings and the like, which consists in forming a suitable trench where the exterior wall is to be erected, and simultaneously placing in position a lining for said trench, from the top downward, as the work of forming the trench progresses, then placing braces between the two linings, so as to transmit the exterior pressure to the core of earth within such proposed wall, and then erecting within the trench a wall of less thickness than the width of the trench.

"2. The process of making and placing in position substructures for buildings and the like, which consists in forming a suitable trench where the exterior wall is to be erected, and simultaneously placing in position a lining for said trench, from the top downward, as the work of forming the trench progresses, then placing braces between the two linings, so as to transmit the exterior pressure to the core of earth within such proposed wall, then erecting within the trench a wall of less thickness than the width of the trench, and, as the wall progresses, substituting for the braces between the two linings braces between one of the linings and the wall."

"10. The process of making and placing in position substructures for buildings and the like, which consists in forming a suitable trench where the exterior wall is to be erected, and simultaneously placing in position a lining for said trench, from the top downward, as the work of forming the trench progresses, then placing braces between the two linings, so as to transmit the exterior pressure to the core of earth within such proposed wall, then erecting within the trench a wall, then substituting for the core of earth within such proposed wall suitable permanent braces to take the exterior pressure transmitted through the wall."

Francis M. Parker and Donald M. Carter, for appellant.

Charles C. Linthicum, for appellees.

Before GROSSCUP and BAKER, Circuit Judges, and HUMPHREY, District Judge.

BAKER, Circuit Judge (after stating the facts as above). Appellant's brief says:

"The problem confronting Ewen was, first, rigidly to hold adjacent streets and heavy buildings on the treacherous soil of Chicago from falling bodily

into the deep hole or trench necessary for a deep substructure while the same was being excavated and the walls erected therein; and, second, simultaneously to manipulate the substances under such streets and buildings so as to produce a seal to minimize the escape of fluid or like substances therefrom, to protect the exposed side of the excavation from air-slacking, and to compress such substances sufficiently to accommodate for the change incident to the escape of fluids and solids, air-slacking, and the like."

The process that Ewen evolved to meet the problem consisted, according to appellant's statement, of—

"digging a continuous trench as distinguished from a series of holes; lining the sides of this trench with separately yielding flexible members; supporting the trench from such flexible yielding members on one side to those on the other by means of adjustable and extensible braces; working those braces continuously to expand and enlarge the trench as occasion requires to seal the surface of the trench, and compress and manipulate the substances under the streets and buildings; building the wall preferably of vertical steel members between the trench faces, when desirable; transferring the pressure to shorter jacks between the trench lining and the wall, if the wall be not built against the trench lining or be of steel members; and then ultimately transferring the load from the wall to the steel structure within the building."

The essential and distinguishing features of this process are said to be—

"the use of the relatively thin, floating, and flexible trench lining in connection with adjustable braces or jack-screws, and the constant operation of the latter to adjust the former so as to minimize, during the operation, the subsidence of the soil in the vicinity of the operation under the weight of, for example, heavy buildings which may surround the lot where the excavation for the new building is taking place."

Ewen's process, so the brief declares, recognized the fact that expert house-movers have a delicate sense of feeling, through jack-screws, which is lacking in other workmen; and the real invention, therefore, lay—

"in putting into the trench a gigantic, living, feeling, moving mechanism, consisting of flexible, floating lining sections, a multitude of extensible jacks, and men who have 'the feeling' not familiar to others, with instructions to climb up and down these jacks day and night to work them to maintain conditions of safety. Ewen created a kind of mechanical Biareus, who, in the depth of this pit at this place of awful danger, day and night spreads his hundred hands out over the face of the exposed wall, feels it, and, whenever occasion requires, manipulates it, pushing the flexible lining in here and there in spots, taking up the slack, expanding and enlarging the trench in an irregular manner, so as to make it respond to the changed character, nature, and quantity of the material as revealed here and there over the surface by the hands of this sentient machine."

Thereupon appellant asks that claim 1 (and claims 2 and 10 in like manner) be construed to read:

"1. The process of making and placing in position substructures for buildings and the like, which consists in forming a suitable trench (which may be of any desired length, regardless of the nature of the work, as distinguished from a pocket which must contract as the work increases) where the exterior wall is to be erected, and simultaneously placing in position a (floating and flexible) lining for said trench, from the top downward, as the work of forming the trench progresses, then placing braces (adjustable and extensible)

between the two linings (and manipulating them) so as (adjustably) to transmit the exterior pressure to the core of earth within such proposed wall, and then erecting within the trench a wall of less thickness than the width of the trench."

The patent is for a mechanical process—a series of prescribed steps to be taken by the user in order to reach a certain mechanical result. Claim 1, as written in the patent, directs the user to take four steps: (1) To form a suitable trench; (2) to place in position a lining for the trench, from the top downward, as the work of forming the trench progresses; (3) to place braces between the two linings, so as to transmit the exterior pressure to the core of earth within the proposed wall; and (4) to erect within the trench a wall of less thickness than the width of the trench. Comparing this with the proposed interpretation, it will be seen that additions have been made to the wording of the first, second, and third steps. Would a builder, on reading only the claim in the patent, understand that he would be violating instructions if he should use slabs of stone, or concrete, or inflexible wood, instead of "flexible" boards which could be bent and pushed into the wall of the trench here and there in spots? And likewise that he would be outside of the patent if between the linings he should put braces, which, when adjusted and extended, would passively support the external pressure against the core, and should fail to put in braces which could be farther extended so as actively to pack and compress the soil under adjacent structures? We think not. And we do not understand counsel for appellant to contend that the natural and obvious interpretation of the claim, apart from the drawings and description, is otherwise.

That the prior art fully anticipates the claim as it stands alone is a fact that needs no elaboration. It is clearly established by the record; and appellant's insistence upon the proposed interpretation, above stated, is of itself sufficient proof.

Appellant, of course, is entirely right in saying that the claim must be construed in the light of the specification, and that the patent should be treated with a view to save it, if possible. With these principles in mind, it remains to consider whether the specification furnishes such definitions of terms or such statements of the process that, taking the document as a whole and weighing everything within the four corners thereof, a fair basis can be found for adopting the proposed interpretation.

What was the prior art as disclosed in the patent? In other words, what was the applicant's statement of the problem he was undertaking to solve? Did he show to the Patent Office (what the diligence of appellees has brought into this record) that it was old to make substructures "for buildings and the like" by forming a suitable trench where the exterior wall is to be erected, and placing in position a lining for said trench from the top downward as the work of forming the trench progresses, then placing adjustable and extensible braces between the two linings, so as to transmit the exterior pressure to the core of earth within such proposed wall, and then erecting within the trench a wall of less thickness than the width of the trench? Did he

point out that this old process, as a process for building substructures, was all right as a general thing, but that coincidently there was frequently another problem—that of sustaining adjoining structures, that he was dealing with the latter problem, and that his invention lay in packing and compressing the soil under such adjoining structures by means of constantly manipulating extensible braces against floating and flexible trench linings, so that underpinning and shoring would be done away with and the structure be sustained without direct contact? Not at all. On the contrary, the evils that he proposed to remedy were those that came from making the complete excavation before beginning to erect the walls. "According to the old method, when the excavation has been completed, the foundations are laid, and then the structure begins to rise story by story from the bottom until it reaches the street level." One evil was that the removal of all the earth from within the proposed wall in advance of the building operations required the "temporary retaining structure" to be supported by long shores extending to the bottom of the excavation, involving the danger and expense of shifting the shores and providing longer and longer ones as the work of making the excavation progressed. This evil was remedied by retaining the "core" as a backing against which the "temporary retaining structure" could be supported by comparatively short braces, easily and securely placed in position. The other evil was the delay and loss of time involved in waiting to begin the superstructure until the substructure should be completed. This was overcome also by the "core" method; that is, the naked columns were erected on the foundations in the bottom of the trenches and interior bores, and then the superstructure and the substructure could be built simultaneously, upward and downward from the street level, without waiting for the remainder of the excavating to be done. So, on examination of the entire document, with a view of gathering the applicant's disclosed idea of his invention, we conclude that the drawings and description accord with the obvious reading of claim 1 in showing that the applicant believed (mistakenly) that he was entitled to a monopoly of the "core" method.

The drawings reveal no indications of floating and flexible linings pushed irregularly into unequally plastic trench walls.

The quality of flexibility is nowhere stated in the description of the process.

The patent, being for a process, should contain a distinct statement of each step, or, at the least, an unambiguous inference of any step that is not distinctly stated. Claim 1 as written names four steps. Appellant's brief names five. The additional step (directing the user to manipulate the extensible braces constantly so as to push back and compress the substances under adjoining structures) is the step that is now relied on to distinguish the claim from the prior art. If it be contended that the step is to be inferred because jack-screws (adjustable and extensible braces) are pictured and named in the specification, then, in our judgment, it was as easy for Ewen to draw the inference from the prior art (McKiernan's patent, No. 145,116, December 2,

1873, for instance) as it would be for the skilled builder to draw it from the present patent. But such an inference is not the inevitable one, for adjustable and extensible braces have the capacity of being adjustably and extensibly used as passive supports as well as active pushers.

Practically the whole contention has its basis in the presence of part of one sentence in the specification:

" * * * and in the operation of a large building (the jack-screws) would be constantly attended and operated so as to keep the condition substantially uniform."

This means, we think, that if the process theretofore fully described in the specification was being used alongside a large building, the jack-screws would (if necessary) be constantly attended and operated "so as to keep the condition substantially uniform." But we do not deem it fair interpretation to take a single expression in a specification and from that determine the color of a claim. Rather should the single expression take its color from the specification as a whole. So viewed, we think it clear that Ewen said:

"I have remedied the old excavating troubles by my new 'core' process, which consists (claim 1) in forming a trench, placing linings in position as the trench goes down, putting braces between the two linings so as to transmit the exterior pressure to the core of earth within the proposed wall, and erecting within the trench a wall of less thickness than the width of the trench. This process can be employed whether the earth be wet or dry, or plastic or firm, and whether adjoining structures, if any, be small or large. If the tension of the braces as originally placed to transmit the exterior pressure to the core should change by reason of the nature of the soil or the amount of weight thereon, of course you should manipulate the braces so as to keep the condition substantially uniform. But such manipulation is no part of the invention that I have hereinabove described and shall presently claim. It relates merely to a contingency that may or may not arise during the practice of my invention, wherein the retention of the core of earth within the proposed wall is the essential and distinguishing feature."

As it is equally impermissible to read the proposed limitations into claims 2 and 10, we affirm the decree of the Circuit Court.

Affirmed.