KARL KIEFER MACH. CO. et al. v. UNIONWERKE, A. G.

SAME v. HEYMAN.

(District Court, S. D. New York. December 17, 1914.)

Nos. 9–276, 10–84.

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—FILTER PULP PACKING MACHINE.

The Kiefer reissue patent, No. 12,455 (original No. 797,122), claims 9 and 10, for a filter pulp packing machine for pressing filter cake for beer filters, *held* valid, but not infringed.

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—BEER FILTER.

The Kiefer patent, No. 993,780, for a filter for straining beer and ale, claim 1, is valid, but in view of the prior art is entitled to only a narrow construction; as so construed, *held* not infringed.

3. PATENTS (§ 328*)—VALIDITY—BEER FILTER.

The Kiefer patent, No. 1,015,326, claims 14 to 17, inclusive, and 19 to 22, inclusive, for a filter for straining beer, etc., which were introduced by amendment pending the application, without any supplementary affidavit, are void for lack of description; certain of the elements claimed therein being entirely absent in the proceedings up to that time, not only from the specification, but also from the drawings and claims. Claims 23 to 25, inclusive, for a filter cake as a new article of manufacture, also *held* invalid, for want of novelty.

4. PATENTS (§ 328*)—VALIDITY—BEER FILTER.

The Kiefer patent, No. 1,023,254, for a filter for straining beer and ale, is void for lack of novelty in view of the prior art.

In Equity. Suit by the Karl Kiefer Machine Company and Karl Kiefer against Unionwerke, A. G., and against Nathan H. Heyman. On final hearing. Decrees for defendants.

Henry D. Williams, of New York City, for complainants.

Wetmore & Jenner, of New York City, for defendants.

SANBORN, District Judge. Infringement suits on three patents for a filter for straining beer and ale, including also claims for the filter cake itself, and on one reissue patent on a press for packing the filter cake. There is also included in the Heyman case a cause of action for the repeal of a later patent issued to defendant Heyman as assignee of Benno Danziger. The patents involved are:

Reissue patent No. 12,455, to Karl Kiefer, dated February 20, 1906 (original applied for June 12, 1905, No. 797,122).

Patent No. 993,780, to Karl Kiefer, applied for April 16, 1906, issued May 30, 1911.

Patent No. 1,015,326, to Karl Kiefer, applied for February 12, 1906, issued January 23, 1912.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Patent No. 1,023,254 to Karl Kiefer, applied for April 23, 1907, issued April 16, 1912.

The Danziger patent, No. 1,029,915, sought to be repealed as an interfering one, was applied for July 12, 1911, and issued to Nathan H. Heyman June 18, 1912. It is alleged that this application was for the improvements in filters covered by the Kiefer application, resulting in patent 1,023,254, and that the patent was issued by inadvertence or mistake.

In addition to the defenses of lack of novelty and noninfringement, several relating to certain of complainants' patents are pleaded and relied on. These are specifically mentioned in this memorandum in connection with the discussion of the respective patents. Seventy-five prior art patents are pleaded in the answers, and many prior publications. Thirty-two of these patents are particularly relied on as anticipations in whole or part, as well as several exhibits of filters, filter frames, and filter cakes.

In the manufacture of beer it is necessary to filter out certain waste matter after fermentation, particularly what remains of the yeast, and to be efficient the process must be rapid. It is done by forcing the liquid through compressed wood pulp or cotton fiber of a density sufficient to retain the impurities, but allow the clear liquid to be forced or drawn off. This is called the racking-off process. In modern filters a barrel per minute can be thus purified. After use for a certain time the machine and filter plates must be thoroughly cleansed, and the pulp or fiber cakes broken up into "filter mass" and washed for repeated use in other cakes, to be again pressed and used in future filtering. The following further description is taken from Mr. Jenner's brief:

"In order to use pulp as a filtering material it is necessary to compress it, more or less, which closes up the interstices between the fibers and renders the mass capable of restraining the impurities which it is desired to remove from the liquid and permit the liquid to pass through. The completeness of this removal, and hence the efficiency of the filtration in this respect, depends upon the degree of compression; the greater the compression, the closer the fibers lay together, and the more difficult for impurities to pass through. At the same time, the denser the material, the slower the liquid passes through for a given pressure, and the greater the pressure the speedier the filtration. The compression, therefore, of the layer of pulp will depend upon those two conditions, the degree of clarification, and the speed of filtration which may be desired, and to meet these varying requirements the degree of compression is left to the judgment of the operator. The conditions mentioned will vary in different cases, but for such a liquid as beer an average must exist in actual practice, to meet which the degree of compression and degree of density may be standardized. In the trade and in some of the patents the pulp is called 'filter mass.' In some of the early patents the filter mass was compressed in the filter itself; in others the filter mass was compressed outside of the filter itself, in a press adapted to compress the filter mass into the form of layers or cakes, suitable to be put into the filter, or in frames which, when aggregated, constitute the filter. From the beginning marginal compression of the filter layer was effected in order to produce a gasket effect and prevent leakage of the unfiltered liquid around the edge of the filter layer, without going through the filtering medium itself. This was, of course, a necessary precaution."

In modern practice the pulp is not used as a gasket, but the round filter cakes are placed in the filter somewhat like coins in a portable

savings bank. On each side of the cakes (top and bottom) are the flat circular disks or filter plates, with means for allowing the liquid to escape through their edges and centers, or edges alone, under pressure. A silver dollar would be a small copy of the filter cake, if its edge were compressed to half the thickness of the center portion.

Mr. Kiefer has taken out a number of patents for filters and filter cake presses. He entered the field in 1897, and has had applications in the Patent Office much of the time since. He was accustomed to do his own soliciting, and acquired a considerable degree of skill in that line, in spite of the fact that he was educated in Germany, and has not fully mastered the English idiom. He was his own expert witness, and showed a thorough knowledge of the filtering art.

It may fairly be said, I think, that the filtering art was pretty well developed when Kiefer began applying for patents, especially by 1901, when one of his earlier inventions was applied for; the first patent in suit dating from 1905. Most of the things which Kiefer introduced in his combination claims were already known, so his work was mainly improvement, by a more exact or refined application of old principles. Adams & Westlake Co. v. Peter Gray & Sons (D. C.) 206 Fed. 303. Defendants put in evidence parts of a German filter found in Everard's brewery, New York City, known as the Enzinger machine, and drawings of all the filter parts. Apparatus of this kind was brought from Germany in 1893, and used down to 1905. A later and stronger form, called the "Mammut," was brought over in 1905. The press in which the pulp plate was made is shown in Enzinger's German patent, No. 69,-405, of 1893, and his American patent, No. 605,706, of 1898.

In order to properly value what Mr. Kiefer has contributed to the beer-filtering art, a brief description of the Enzinger press and filter may be profitable. It is obvious that the Mammut type, so far as it is merely heavier and stronger and has the same mode of operation, is a mere development of the early kind. It is of the battery type, where the frames are brought together in a vertical position and screwed up, so that the filter, when fully put together, is horizontal in its position. This may be illustrated by likening the frames to wire screens for windows, with the wire in the center plane of the screen, and having the wooden frames very thin. Suppose a number of them are set up vertically and juxtaposed, and holes are bored through two opposite corners of the frames, so as to make two continuous channels through all of them. Obviously one channel may be used to introduce liquid to the inside of the frames, and the other to take it out, provided slots or holes be made from the inner sides of the channels into the frames. The frames being clamped up tight, and both ends of the battery or row of frames being made water-tight, the liquid forced from the channel into the inlet slots must go through the frames sidewise, and escape from the outlet slots on the opposite side. Now, if each alternate frame be covered on each side of the woven wire with a thin filter pulp cake it may be seen that the liquid may be so introduced that it must run through the filter cake before passing out through the outlet slots, and leave its impurities behind in the pulp. This may be taken as a rough description of the Enzinger filter, although in that there are four channels, two

218 F.—54

at alternate corners of the plates, so that the cloudy and clear liquid is put in and taken out through parallel channels at one corner only; the channels at the opposite corner being used for the escape of air and gas.

In order to prepare the alternate frames with a filter pad or cake on each side of the centrally located wire screen, it is necessary to have a press, consisting of a drum or container into which the frames will fit tightly, and means for exerting pressure. A thin mixture of water and pulp is poured into the drum (which is provided with a perforated bottom), then a frame, and then an equal amount of the fibrous mixture. Pressure being applied, the water escapes through the perforated bottom, and through the piston or top and sides (both perforated), until the cake is pressed to the proper thickness. The side walls of the container just opposite the completed cake are made impervious to water. The pulp frame (or stuff frame) is then taken out and placed in the filter rack, with an alternate empty frame, then another is made, and so on until the filter of 10 or 20 frames is complete. Rubber gaskets were placed between the flat sides of the edges of the plates, so they would make a water-tight battery when clamped together, with impervious end plates, leaving openings only at the channels for the liquid and gas.

Presses and filters, such as attempted to be described, were in quite general use when Mr. Kiefer entered the field, and are fully described in four or five Enzinger patents, some of which were issued before 1897, the time of Kiefer's first application, and all before he applied for the eldest patent in suit. Other inventors, also, like O'Hanlon and Theurer, brought out filters prior to 1900.

The wire screen mentioned as an illustration was, like all of the Enzinger frames or "grids," perforated, and the screen fine enough to keep the fibers of the filter mass from passing through it; that is, it was both "perforate" and "fibre-retaining." Some of the Enzinger grids were fiber-retaining, and others light open frames, with variously perforated centers. Curiously enough, Mr. Kiefer's first patent application, filed in 1897, as well as the claims allowed, call for an imperforate frame or grid, which is made an important element of a later patent now in suit. In this first patent, No. 579,586, issued to Karl Kiefer March 30, 1897, it is stated that he obtains a more simple construction, an even, homogeneous pulp layer, and simplifies the filtering operation. These objects he obtains principally by the specially constructed filter plate, which is shown as imperforate, and having intercommunicating channels, also claimed in one of the later patents in suit.

Mr. Kiefer's second application was also for a filter, and was applied for April 29, 1901, patent issuing January 10, 1905, No. 779,607, containing 62 claims. The gist of the disclosure is that coarse wire cloth between the filter cakes may be profitably used for the inlet conductors, and coarse wire cloth covered with fine wire cloth for the outlet conductors; the fine cloth with meshes of an eighth of an inch being fiber-retaining. In this patent several of the elements of patents in suit are either explained or referred to, such as marginal

compression, nonhomogeneous filter cake, telescoping of filter elements, and the notion of compressing the filter layers outside the filter. As to most of these means for producing the effect referred to are also shown.

Another application by Mr. Kiefer was filed March 6, 1903, patent issued February 20, 1906, No. 812,931, for improvements in liquid conductors or filter plates. The patent covers marginal compression and a new form of imperforate plate. It is called a pan having a plane imperforate bottom.

A little later in 1903 an application for a press patent was filed, issued January 10, 1905, No. 779,548. Its object was to keep a wire outlet conductor properly centered in the pulp while compression was going on. It has no relevancy to this suit.

A single further application for a filter patent was made before the first of the patents in suit, on April 7, 1904, issued February 20, 1906, No. 812,932. This application, however though filed 11 months before that of the original press patent, uses a number of the same drawings, and seems to have been a companion application, one for the press, the other for the filter. It will not, therefore, be treated as an anticipation of No. 12,455, reissue. As to the three others in suit, it contains edge compression, and assumes that the filter cakes have been previously formed for insertion in it.

Other inventors besides Kiefer had also added something to the art prior to Kiefer's application for the first patent in suit. J. F. Theurer, of Milwaukee, had taken out several patents. In two issued in 1899 he shows edge compression. He says the pulp is compressed between rings to such an extent that no liquid can pass around the edge of the cake, and the same element is claimed in his patent No. 618,965.

[1] *Validity of the Press Patent.* On June 12, 1905, Mr. Kiefer applied for a patent on a press or pulp-packing machine, and it was issued August 15, 1905, No. 797,122. A few months later he applied for a reissue, and it was granted February 20, 1906, No. 12,455. The gist of this patent is the production of a nonhomogeneous filter cake, being one more compressed in its center than in other parts. The idea is that the thin pulp, suspended in water, should be kept even throughout its whole extent; that is, without any lateral movement of the fibers, which might make it uneven and so imperfect. This is to be secured by permitting the water to escape only through the filter plates at the top and bottom of the filter mass, and not at the sides of the cylindrical container. Then, in order to secure the edge compression, central hubs, ring-shaped projections or protuberances are attached to the respective tops and bottoms of the inside edges of the filter plates, so placed that the distance between these hubs is only half what it is between the plates. That part of the cake between the hubs will be compressed to half the thickness of the rest. Mr. Kiefer's theory is explained in his specification as follows:

"If the perforated plate *13* and also the perforated plate attached to the cover *12* have central and ring-shaped projections *14* and *15*, as shown in Figs, 3, 4, and 5, the filter mass will be more compressed at the center than at any other part, as shown by the increased number of dots. In fact, it may by these projections be compressed to perfect dryness and imporosity. I will

explain the reason why this is the case. It is made possible in one operation by the fibrous nature of the filter pulp and facilitated by pressing the water out in two opposite directions only—namely, top and bottom. If the filter pulp would be an absolutely plastic material, the result would be a perfect homogeneous pulp layer. Now the plasticity of the pulp disappears with the loss of its moisture, and while it is still compressible up to dryness it is not perfectly plastic or ductile in all directions. In the position shown in Figs. 3, 4, and 5 the fibres around the center cannot escape from their place during pressure, as would be the case with a perfectly ductile material; but by reason of the interlacing of the fibers they have to remain at their places. By expressing the water in two opposite directions only—namely, top and bottom—I keep the fibers in a relative position of rest within the pulp layer horizontally, and a perfect nonhomogeneous filter layer is the result, while if I were to extract the water from the sides of the cylinder the fiber would move in radial directions, following the flow of the water, and the result would be an imperfect layer. While at each place of the filter layer the same amount of fibers is compressed, the ratio of compression in the filter layer may vary from one to two to one to four up to imperviousness."

This theory, which Mr. Kiefer says is not yet believed in, is supposed to be corroborated by a later patent to Loew, No. 959,021, where it is said:

"I have discovered * * *. that if the inner tube is perforated, and the outer drum is substantially not perforated, the filter mass will be packed more tightly against and around the perforated surfaces than the imperforate or less highly perforated surfaces."

Claims 9 and 10 of the reissue patent are in question:

"Claim 10. In a filter pulp packing machine, the combination of (1) a container, of (2) a plane bottom and (3) a plane cover to such container, (4) means of approaching both of them so as to express the liquid from the pulp within the container, of (5) protuberances attached to the bottom and top adapted to produce a stronger compression upon the filter pulp in contact with said protuberances than is produced upon the rest of the filter pulp."

In claim 9, element 5 reads thus:

"(5) Means producing during such approach a materially stronger compression to some parts of the pulp than to others."

Whether or not Mr. Kiefer's theory is correct is impossible to find out, but he was the first to produce in filter cakes a high degree of edge compression, and transferring these cakes from the ring-shaped projections of the press to the like projections of the filter. There is a new mode of operation and an improved result. Edge compression was not new, but Kiefer gets more of it, and a more convenient operation. The perforated protuberances were new, and may have some effect. Kiefer made a forward step, so, if the reissue is valid, the patent should be sustained.

*Was the Reissue No. 12,455 Authorized?* I think that the invention shown in the first application was not broadened in the reissue, because both specifications and drawings show the perforated protuberances. Under the rule of Topliff v. Topliff, 145 U. S. 156, 12 Sup. Ct. 825, 36 L. Ed. 658, the commissioner's decision on inadvertence, accident, or mistake is not reviewable by the courts, except in plain cases. Kiefer having originally shown protuberances, and perforations in them, but not having clearly claimed either in the first patent, it would seem he was within the reissue statute; even though his

motive or reason may have been that another application for a non-homogeneous filter layer was disallowed in the Patent Office.

I think, therefore, that although the notion of marginal or medial compression was not itself new, that of the fiber movement was, and that when Kiefer put them together, with the other combined elements, in claims 9 and 10, he made a forward step. The means mentioned in claim 9, in view of the specification, signify perforations in the rings. The reissue is valid, and it should be so decreed.

*Infringement.* The only thing really new in the reissue is the preforated protuberances, which defendants do not have. In the main they took their press from Enzinger, with improvements suggested by the state of the art, to which Kiefer had contributed his share. They use a perforated circular drum or container, while that of the patent is impervious. Means and operation are different, though result may be the same.

Mr. Kiefer's theory of infringement is as follows: The upper two-thirds of defendants' circular container is perforated to allow lateral escape of the water, and the lower one-third, opposite the compression rings, is imperforate. During the first part of the compressing operation the water escapes through the side holes, carrying with it some of the adjacent fibers, until by the lowering of the compression plate the perforations are passed and the lower imperforate part is reached. The testimony then continues:

"Q. And by that time you have got such a consistency of the mass that the fibers are interlaced by that flow? A. By that time I have reached the lower part—let us say, quarter—of the piston, and I have such a consistency of the pulp in the cylinder that the fibers do not move any more with the water; that means they would not move any more following any particular flow of water, but they are .fixed in a horizontal direction; they cannot move sideways any more, but they can still be compressed."

On the theory here expounded, defendants obtain a better result by different, and, as I think, not equivalent, means. While the Kiefer press has been commercially successful, this, of course, is no evidence that defendants use it. I think they do not.

[2] *Validity of the First Filter Patent.* The Kiefer patent, No. 993,780, was applied for April 6, 1906, forfeited, renewed February 23, 1911, and patent issued May 30, 1911. There has been no commercial use of the invention. The only claim in suit follows:

"Claim 1. In a filter, the combination with (1) filter layers of compressed moist pulp, of (2) a nonwoven, imperforate liquid conductor of a .single manufacture between them and in direct contact with the fibers of said pulp, (3) with means for the admission of the cloudy liquid and for conducting the clear liquid away."

We quote from Mr. Williams' brief as to this invention:

"This patent for the first time in the filter art discloses a unitary nonwoven imperforate liquid conductor arranged between and in direct contact with the fibers or filter layers of moist compressed pulp. A perforate liquid conductor thus arranged had been used before, but no one 'had discovered how to produce an imperforate liquid conductor capable of such use. An imperforate conductor has very substantial advantages in strength, in ease of manufacturing, in cheapness of manufacture, as well as in ease of cleaning. A filter is a device for catching dirt, and every part must be

capable of thorough cleaning, and ease of cleaning is a desideratum of daily advantage in the brewery in the cleaning of large numbers of plates."

On the hearing it was substantially agreed by witnesses and counsel on both sides that the imperforate grid operates the same as the perforated or open one. If so, there is little substantial difference between this and Enzinger. Kiefer's first patent, No. 579,586, as well as 812,-931, shows an imperforate conductor; also the earlier English patent of Capillery, No. 1,307, of 1890. As to the substitution of a perforate for an imperforate bottom for a caramel holder, see Glen Rock Co. v. American Caramel Co., 209 Fed. 619, 126 C. C. A. 579.

The patent should be narrowly sustained, but held not infringed. Defendants' pan is not just like it. The fact that theirs is made of three pieces riveted together is of no consequence. "Single manufacture" means use without any screen or cloth.

[3] *The Filter Claims of 1,015,326.* The narrowest claim is 15, and the broadest 19.

"Claim 15. In a filter, the combination of (1) a flat disk-shaped filter layer of moist, fibrous pulp, and (2) a plate having a thick outer marginal part and a thinner interior part (3) having an annular channel around inside the thick marginal part, and (4) having transverse channels intercommunicating through said annular channel, (5) said filter layer being previously compressed extraneously of any filter structure with which it is in contact during filtration, (6) with its outer marginal part more highly compressed than its interior, to correspond with the thick marginal part of the plate, and (7) its interior less compressed part being supported across said annular channel from the thicker marginal part to the thinner interior part, and across the transverse channels of the interior part, leaving said annular channel and said transverse channels open."

"Claim 19. In a filter (1) a liquid conductor with intercommunicating channels, and (2) a filter layer composed exclusively of moist, fibrous pulp, previously compressed extraneously of any filter structure with which it is in contact during filtration, (3) with its fibers in direct contact with said liquid conductor."

All the elements of claim 15, except the fifth, are found in some form in Enzinger, and in Kiefer's earlier patents. This element not only calls for extraneous manufacture of the cake, but also using it without any supporting structure. The patent law covers "any new and useful art, machine, *manufacture* or composition of matter," without any regard to where it is made. Consequently the function performed by the filter cake, and not whether it was made in the filter or in an outside press, is the proper matter of inquiry. If a filter cake "made in Germany" works better than one made in the filter itself, and sustains a different relation to the other filter elements, the combination so limited might be a good one.

This limitation refers to the practice both of using the filter as press and a filter, and that of forming the cake in a press and transferring the frames without removing the cake, as in Enzinger and in Kiefer reissue. The language of this element is very rigidly limited:

"Said filter layer being previously compressed extraneously of *any filter structure with which it is in contact during filtration.*"

So if defendants in any way supported their filter cake, by a wire screen or a piece of both, they would not be within these claims. They

do not use any such support. Enzinger is also excluded because he removes from his press into his filter both the layers and the filter frames on which they are formed.

The extraneous compression referred to is made functional by the claims and description. In his argument for allowance, of October 20, 1911, Mr. Kiefer makes this quite plain. He says:

"These corrugated plates that applicant discloses cannot be successfully used with layers compressed directly in the plates. Extraneous compression is essential. If such a plate be placed in a press, like that of my reissue patent, cited, and wet pulp poured upon the plate and compressed in it, the filter mass will be pressed into the corrugations, and no filtering combination will result. Extraneous compression, bringing the layer into the right shape, and into the right consistency in its filtering region, before it comes into contact with the corrugations of the plate it is to be used with, is, therefore, absolutely necessary. This should make it clear that the use of pulp filter mass, as disclosed in the Kiefer patents cited, would not teach anything to guide the user of corrugated plates, to combine them with a pulp layer that would operate with them.

"The cloth of Sperry would support itself across the corrugations, but it did not have the filtering qualities of pulp, any more than did it impose the conditions that pulp does, in the use of it. Had I used the Sperry plate plus the Sperry cloth, and pressed against this cloth the wet filter mass, as shown in the Kiefer patents cited, the examiner would, with small doubt, be right. I would have used a Sperry plate with the old Kiefer pulp layers. But I would have used the cloth as a fiber-retaining screen, and as a supporting structure across the corrugations. I would not have dispensed with the supporting structure—the cloth.

"However, the present invention not only allows the pulp layer to be used free from all protecting and reinforcing structures, but also allows it to be produced independently from the filter apparatus or appurtenances with which it is to be used during the filtering operation. A pulp layer is, therefore, by my disclosure, used as if it were really a cloth sheet, so far as preliminary handling is concerned. But this layer, with these new properties, shown for the first time, should therefore be patented.

"This assertion is also supported by other circumstances. Filters such as Sperry's, using cloth sheets with various plates, are at least 40 years old in the art, and pulp layers, in one form or another, date back at least 30 years. Had it been so simple, as the examiner implies, to merely substitute a pulp layer for a cloth layer, it would most probably have been done long ago.

"For one familiar with filtering, it is hardly necessary for me to dwell upon the importance of simplifying a pulp layer to the extent of making the use of strong, simple, sanitary plates possible, while doing away with cloths or screens. This I have done, and I believe my claims now express my invention correctly, and they should be allowed."

It will be noticed that elements 3 and 4 are an annular channel around inside the thick marginal part, and transverse channels intercommunicating through the annular channel. Both of these elements appear for the first time in the renewal claims filed after July 13, 1911. Neither is mentioned in the specifications, original or final. Defendants insist that the patent is void for lack of description, and because new matter was put into the renewal claims without any supplementary affidavit. The channels claimed can be made out from the drawings if Figure 3, which was introduced after renewal, is compared with Figure 2. As Mr. Waterman says, "Figures 2 and 3, taken together, make the matter clear." From Figures 1 and 2 alone it seems impossible to determine whether the portion of the plate just inside the thick marginal part is intended to be deep enough, or of a shape or form, to make

any channel at all, or whether it is to communicate with the other channels. Something may probably be inferred from the arrows shown on Figure 2, but even with them the annular channel is not clearly shown. So we have the case of renewal claims covering elements entirely absent in the original proceedings up to the renewal—absent, not only from the description, but also from drawings and claims. These channels perform the important function of circulating the liquid, and when they appear for the first time in the renewed application cannot be otherwise than new matter.

The statute requires written description. As Mr. Justice Brown said in the Incandescent Lamp Patent Case, 159 U. S. 465, 474, 16 Sup. Ct. 75, 78 (40 L. Ed. 221):

"It is required by ' Rev. Stat. § 4888 [Comp. St. 1913, § 9432], that the application shall contain a written description of the device 'and of the man- ner and process of making, constructing, compounding, and using it in such full, clear, concise, and exact terms as to enable any person, skilled in the art or science to which it appertains or with which it is most nearly con- nected, to make, construct, compound, and use the same.' The object of this is to apprise the public of what the patentee claims as his own, the courts of what they are called upon to construe, and competing manufacturers and dealers of exactly what they are bound to avoid."

There is a multitude of decisions construing this provision. While the courts are reluctant to avoid a grant for failure to describe it, especially where the grantee has occupied territory under it, they have often been compelled to do so. If an invention has gone into general use, and skilled workmen have been able to construct the device or machine in an acceptable form, defects in description will often be overlooked. The Grant Tire litigation is a curious illustration. Grant did not explain how the two parallel wires should be put on, those which hold the tire in place, and whose tension secures the oft-mentioned "side-tipping function." But the device took a certain form, universally employed for properly setting the tire. The patent was sustained in this circuit (Rubber Tire Wheel Co. v. Columbia Pneumatic Wagon Wheel Co. [C. C.] 91 Fed. 978; Consolidated Rubber Tire Co. v. Diamond Rubber Co., 162 Fed. 892, 89 C. C. A. 582), and held void in the Sixth (Goodyear Tire & Rubber Co. v. Rubber Tire Wheel Co., 116 Fed. 363, 53 C. C. A. 583). Judge Lurton said that the tipping capacity was not even pointed out, so that no mechanic, following the specifications, would know how tight the wires were to be put on. Finally the Supreme Court took the case on certiorari to the Circuit Court of Appeals of this circuit, and affirmed its decision upholding the patent. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U. S. 428, 31 Sup. Ct. 444, 55 L. Ed. 527. This liberal rule should not apply, and never has been applied, to a patent which has not had a pronounced success.

Counsel for defendants cite a number of decisions upon the necessity of a full and clear description, and that new matter requires a supplemental oath. Railway Co. v. Sayles, 97 U. S. 554, 24 L. Ed. 1053; Eagleton Mfg. Co. v. West, 111 U. S. 490, 4 Sup. Ct. 593, 28 L. Ed. 493; Steward v. American Lava Co., 215 U. S. 161, 30 Sup. Ct. 46, 54 L. Ed. 139; L. H. Gilmer Co. v. Geisel (C. C.) 187 Fed. 606, affirmed

187 Fed. 941, 109 C. C. A. 620; Hestonville, M. & F. Pass. R. Co. v. McDuffee, 185 Fed. 798, 109 C. C. A. 606; Motion Picture Patents Co. v. Independent M. P. Co., 200 Fed. 411, 118 C. C. A. 563; Ney Mfg. Co. v. Swineford Co. (D. C.) 211 Fed. 469; General Subconstruction Co. v. Netcher, 174 Fed. 236, 98 C. C. A. 144. Others are referred to, and many more could be. Cases relating wholly to the sufficiency of description are Gunn v. Savage (C. C.) 30 Fed. 366; Windle v. Parks & Woolson M. Co., 134 Fed. 381, 67 C. C. A. 363; Herman v. Youngstown Car Mfg. Co., 191 Fed. 579, 112 C. C. A. 185.

*The Filter Layer Claims of 1,015,326.* Three of the claims are for the filter cake as a new article of manufacture, which is quite clearly described in the original specifications. Claims for this appear only in the renewed application. The invalidity of claims unsupported by a sufficient description, or introduced as new matter without an additional oath, does not affect those introduced in the renewed application, which are supported by a sufficient description. So the only question here is anticipation.

Mr. Kiefer's idea is to claim a self-supporting filter layer, made so by a strong edge compression, which will form a gasket sufficient to prevent liquid from getting through it. Claim 23 reads:

"With a more compressed outer marginal gasket-forming part, and a less compressed interior filtering part, whereby it is self-supporting."

It seems that Mr. Waterman is correct in saying that, if a filter cake is compressed to be gasket-forming, it is compressed to be self-supporting.

In his argument with the examiner Mr. Kiefer says:

"As regards claims 23 to 25, inclusive, for novel pulp layers, I have amended the claims to express clearly the important fact that these plates are made and handled entirely apart from reinforcing or supporting structures. My machine, shown in reissue patent No. 12,455, it is true, may be used, with certain modifications, to make my new pulp layers, as disclosed in this application. But the new pulp layer was not shown in that patent, nor suggested, either by that patent or by any other disclosure. In both of my patents cited, the pulp layers are confined within surrounding frames, or protected by wire screens, so far as support, outside or inside the filter, is concerned.

"Now, by my new invention, we have a pulp layer that is independent. The process may be old, so far as disclosed in the reissue patent; the modifications of the device for producing the layer, even, may be obvious, after it is seen what kind of a layer is wanted; but the article itself is new. It was not previously disclosed, even though the means for producing it, possibly, were at hand. Patents are unquestionably granted for novel articles of manufacture, regardless of the simple mechanical ability required to produce them. They frequently derive merit through the ease with which they may be produced by some well known means. It is the nature of the article itself, not the process or apparatus for making it, that must be considered.

"But it is clearly permissible to specify in a claim how an article has been produced, although the means of producing thus specified may be old, if such specification, in the claim, makes clearer what the nature of the article is. In this case, the extraneous compression of the pulp layer is essential, as has been explained. Each of the claims sets forth a novel structure, with new properties, and is limited to the details of the structure by which such new properties are attained.

"The reissue patent, notwithstanding its close relation, concerning a means of producing a new filter layer, cannot have any bearing on the article itself. The very fact that the reissue patent, in Figs. 4 and 5, shows a contrivance for reversing the layer, after making it, without disruption, is conclusive as to the circumstances surrounding the disclosure of this reissue patent. From the condition of affairs there exhibited I have made a marked advance step, as disclosed in this application. That contrivance, as well as the screens in the middle of the layer, are rendered obsolete by my present invention, so far as concerns the user of the new type of filter, which type I now make possible."

This is a frank and clear brief for these claims, narrow as they seem to be. When we consider the Stockheim German patent, No. 76,103, issued July 10, 1894, in connection with the Kiefer reissue, it seems quite doubtful whether these three claims can be sustained as patentable. Practically the only difference between Stockheim and Kiefer is correctly stated by Mr. Waterman:

"They are pressed of wet pulp and the patent is devoted to showing how the cake can be pressed of wet pulp, dried, and still have the porosity, so that it is instantly wet by the liquid going into the filter; then the cakes are kept in a sterile condition, put into the filter when needed and they are dry at that moment, if that is what you mean. Then as soon as the liquid is turned on they get wet. Q. They get wet, yes? A. Yes; and the significant part of the specification to the patentee is his disclosure of how to make them so that they are capable of being dried without becoming boardy and nonporous."

Mr. Kiefer's answer to this statement is as good as could be made. He says:

"I do not think it has any reference to these cakes which are here in question. The purpose of these dry cakes in that patent was that they should actually be used, actually put in the filter; they are made of a special porosity, which at great length is described how to be attained, so that the material would be filtered, should go through it and filter, so that the cakes made up as they were could be put into the filter in a dry condition and used as disks. It is very similar to the assemblage of sheets of paper. The structure of dry material also becomes a different one, even if made moist again afterwards. When the filter mass is in a moist condition, it mixes readily with water; but, if once dried out, it is very hard to be softened."

Defendants' filter cakes as shown by Exhibits 12 and 14, seem to substantially answer the Kiefer claims. When they leave the press the cakes are 1¼ inches thick, with their edges compressed to one-half inch. They are piled up on the floor, and gradually swell until they are 2¼ inches thick, and the edges 1½ inches. After they get into the filter, they are compressed about an eighth inch in the center and nine-sixteenths inches at the edge. Thus they have a much greater compression when they leave the press than they ever have again. I have not overlooked the testimony of Mr. Heyman and Mr. Waterman on this point. What Mr. Heyman says is not inconsistent with the exhibits. Mr. Waterman says defendants' cake certainly is not self-supporting. After being out of the press for a few minutes, they cannot be picked up and held horizontally, in one hand. The workmen, he says, take the press ring out of the press with the cake in it, and with a dextrous movement revolve it, throwing the cake out on a flat table, from which it is then taken with both hands and turned into a vertical position, and then carried near to the filter and

piled up on the floor. While being carried, it sags somewhat, but does not lose form. From these facts, and observation in the brewery, it is inferred by the witness that the cakes are not self-supporting, because they can be handled only by special dexterity.

While there is something new here, in that no one had produced filter layers of *moist* pulp which were made outside the filter, and independent of any filter structure, yet it is not everything new that involves invention. Faultless Rubber Co. v. Star Rubber Co., 202 Fed. 927, 121 C. C. A. 285. If a patented product is new, and goes into extensive use without being unduly pushed, it should rarely be held unpatentable; but in this case Stockheim made a self-supporting cake, partly by his method of making it and partly by drying it. The inventive idea was different, but not greatly so. Moreover, only a slight change in the Kiefer press of the reissue patent is necessary to make the filter cake just like that of 1,015,326. Defendants' press is not an infringement of the reissue patent. They had the right to make and sell that press. It produces filter cakes like those of this patent. While it might be technically possible for one to have the right to make and sell a machine whose product was such an infringement as to require absolute prohibition of such product by injunction, yet such right would then be of no value, and should be held to include the incidental advantage of using the product. If a process be decided valid, the product could not be suppressed without putting an end to the process.

Under the "Domes of Silence" Case in this circuit (Barry v. Harpoon Castor Mfg. Co., 209 Fed. 207, 126 C. C. A. 301), and those referred to by Judge Coxe, it might be proper to sustain these filter layer claims, if the product had been made in the Kiefer press and gone into extensive use. But in the absence of this condition of things, and in view of the supposed immunity of the defendants' press, these claims should be held invalid.

[4] *Validity of Patent No. 1,023,254.* Application was filed April 22, 1907, renewed February 23, 1911, issued April 16, 1912. This covers a battery form of filter where no drum is used but the filter frames with the layers between them are pressed together against gaskets, the frames fitting into each other with telescoping ledges, and having exterior extensions with registering openings, as indicated in the explanation as to wire screens in connection with the Enzinger structure. Substantially everything found in this patent appears in 1,015,326, except the gaskets, telescoping and exterior extensions, and these variations were all made convenient by the change of type from drum to battery.

The gist of the invention is the telescoping feature. This is found in many earlier patents among them Kiefer, 779,607, Figures 7 and 9. While not absolutely essential to the battery type, it is a simple and convenient feature, which would readily occur to any one who knew anything about beer filters, whether he was skilled or otherwise. Coaction of filter layers and telescoping ledges is present, but at best the patent is merely a slight advance, requiring no inventive faculty of any description.

*Repeal of Danziger Patent.* This is sought on the ground that some of its claims, particularly 1, 2, 3, 5, and 6 interfere with 1,023,- 254. That patent being considered invalid as to all its claims, it is not necessary to consider the matter. Mr. Kiefer is thought to have no interest in it.

Decrees should be entered adjudging as follows:

Claims 9 and 10 of the reissue patent, valid, but not infringed.

Claim 1 of 993,780, valid, but not infringed.

Claims 14 to 17, inclusive, and 19 to 22, inclusive, of 1,015,326, invalid for insufficient description and want of statutory affidavit.

Claims 23 to 25 inclusive, of 1,015,326, invalid for want of novelty.

No. 1,023,254, invalid for want of novelty.

Complainants not entitled to any relief in respect to the Danziger patent to Heyman.

And that the bills should be dismissed, with costs.